The CITIZENS BANK AND TRUST COMPANY, Bainbridge, Georgia, Plaintiff,

v.

SLT WAREHOUSE COMPANY, Defendant and Third-Party Plaintiff,

Howell MATHIS, Individually, and d/b/a Iron City Grain and Elevator Company, Third-Party Defendants.

Civ. A. No. 1006.

United States District Court, M. D. Georgia, Thomasville Division.

Jan. 2, 1974.

Harold Lambert, Bainbridge, Ga., for plaintiff.

Edward E. Dorsey and Stuart E. Eizenstat, of Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., and Michael N. Herndon, Thomasville, Ga., for defendant and third-party plaintiff.

Ralph C. Smith, Jr., Bainbridge, Ga., for third-party defendant.

## OPINION

ELLIOTT, Chief Judge.

In this action the Plaintiff seeks to recover for losses sustained resulting from shortages in the amount of grain represented by warehouse receipts which it had taken as collateral for loans made by it to the person to whom the receipts had been issued by the Defendant. In its answer the Defendant denies liability to the Plaintiff and by third party action seeks contribution or indemnity from the person to whom its receipts were issued, it being alleged that he is responsible for the shortages.

The case was tried by the Court sitting without a jury on November 29 and November 30, 1973, and this opinion is intended as compliance with the requirements of Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

On or about September 9, 1969 Howell Mathis, d/b/a Iron City Grain and Elevator Company (hereafter Mathis), entered into a field warehousing agreement with SLT Warehouse Company (hereafter SLT), under the terms of which Mathis furnished SLT a warehouse building into which he was to deposit grains and from which SLT was to perform field warehouse services. Mathis deposited grain in the warehouse and received in return warehouse receipts from SLT.

The receipts received by Mathis from SLT were non-negotiable and were understood to be non-negotiable receipts by the Plaintiff, The Citizens Bank and Trust Company (hereafter the Bank), which made numerous loans over a period of several months in 1971 to Mathis based solely upon the receipts which Mathis transferred to them, Mathis being the transferor and the Bank being the transferee of the non-negotiable receipts. The loans totaled over $50,000.-00 and the outstanding balance due on the account at the time of trial was $34,938.40 principal and approximately $7,751.08 interest.

The Bank did not file a financing statement as to the receipted grain and made no investigation of Mathis or of the receipted grain.

Although the fact was not known to SLT or to the Bank, it eventually developed that the grain which was covered by the receipts did not belong to Mathis, but instead belonged to certain farmers who had entrusted it to Mathis, and the shortages which were eventually discovered were brought about by Mathis regaining possession of the grains from the warehouse by various surreptitious means (which will be hereafter more fully described) and returning the grain to the farmers, who were the true owners.

Because of some difficulties with Mathis, on November 17, 1971 SLT notified Mathis of SLT's desire to terminate the field warehouse agreement within thirty days. This notice was also sent to the Bank, SLT being aware that the Bank was holding some warehouse receipts issued to Mathis. At this time there was no shortage of grain. During

this time SLT had exercised reasonable diligence and care in locking and controlling the warehouse facility, in checking Mathis' withdrawals against the withdrawal slips and in making regular audits to check the balance of grain in the warehouse.

After SLT's letters of November 17, 1971 to Mathis and the Bank various representatives of SLT on a repeated basis attempted to persuade the Bank to require Mathis, the Bank's debtor, to immediately liquidate the grain in the facility in order to pay off the Bank's loan. The evidence shows that the Bank refused to require such a liquidation and went along with a piecemeal liquidation which had been suggested by Mathis. The evidence also shows that had the Bank required such a liquidation at a bulk sale as urged by SLT, the Bank would not have sustained any losses. Further, in January, 1972 representatives of SLT informed the Bank of additional difficulties which SLT had had with Mathis, including certain checks issued by Mathis which were returned for reason of insufficient funds. The checking account on which these bad checks were drawn was carried by Mathis with the plaintiff Bank and the Bank was, therefore, aware of the fact that Mathis was "bouncing" checks. In a further final effort to bring the matter to a head SLT directed a letter to the Bank on January 27, 1972 in which SLT stated that "we hereby advise you that we will not assume any responsibility hereafter for any shortages that may occur in the inventory as a result of the conduct of this customer . . . We have advised you of the severe nature of our prior problems with this customer and neither we nor our bonding company desire to accept further responsibility for the conduct or cooperation of this customer in connection with any further inventory shortage." Even after receipt of this letter the Bank took no action to either investigate Mathis or to investigate the status of the grain in queston or to require a bulk liquidation.

In January, 1972 SLT employed a new local agent to look after the warehouse and this agent maintained security over the warehouse on behalf of SLT through a series of locks which were placed on the bins in which the receipted grains were stored and by a lock placed on the power switch which controlled the grain elevator, which was the means by which grain would normally be removed.

As the result of a regular audit made by Mr. Harvey Jay, a field representative of SLT, an initial shortage of grain was discovered in late May, 1972. The shortage of receipted grain discovered by Jay at that time was approximately $35,683.00. When this first shortage was discovered Jay had all of the locks changed on the bins and on the elevator switch and Jay himself retained the only set of keys to these locks. Through his regular audits Jay discovered in August, 1972 that there was an additional shortage of some $8,000.00 in grain, although the new locks still remained on the bins and on the elevator switch.

The evidence makes it clear that the shortages in grain occurred as a result of the fact that Mathis, through a variety of means, took the grain from the warehouse controlled by SLT totally without SLT's knowledge or authority and in a way which was wrongful as to SLT. He did this by bypassing the SLT locks which had been placed on the bin doors by removing the hinges from the doors and loading grain onto trucks by means of a portable auger inserted into the bins and by bypassing the SLT lock which had been placed on the electrical switch which controlled the grain elevator by "hot-wiring" the electrical wires near the switch so that another switch which was supposed to control the operation of another piece of machinery actually controlled the operation of the elevator. These means all circumvented SLT's control and security over the grain. The Court finds as a matter of fact that the shortages were not due to any negligence on the part of SLT, its representatives having taken all precau-

tions which a reasonably prudent warehouseman would have taken in the circumstances.

As has been heretofore noted, the receipted grain which was wrongfully taken by Mathis belonged to the farmers who had entrusted it to him, and after he had wrongfully removed the grain from SLT custody he returned the grain to the rightful owners of it.

## CONCLUSIONS OF LAW

A. *Under the circumstances of this case SLT is relieved of liability because the true owners of the grain, the farmers, received back the receipted grain.*

The Uniform Commercial Code, as adopted in Georgia, defines the term "bailee" as meaning:

"The person who by a warehouse receipt, bill of lading or other document of title acknowledges possession of goods and contracts to deliver them." [1]

So, under the facts here presented SLT was a bailee of the grain.

The Georgia Code further provides that:

"The bailee must deliver the goods to a person entitled under the document . . . unless and to the extent that the bailee establishes any of the following:

(a) Delivery of the goods to a person whose receipt was rightful as against the claimant;

.    .    .    .    .    .

(g) Any other lawful excuse." [2]

It is clear here that the farmers whose grain was on receipt and who received back their grain were persons "whose receipt was rightful as against the claimant". This becomes evident from the distinction made between negotiable and non-negotiable warehouse receipts, as set out in the Uniform Commercial Code as adopted in Georgia. This distinction is made clear in the description of the rights accorded to the holder of a warehouse receipt under Title 7 of the Code.

■ A bona fide purchaser of a *negotiable* warehouse receipt obtains the full protection of the Uniform Commercial Code only if the purchaser obtains the negotiable receipt by *"due negotiation"* and the mechanics of due negotiation are spelled out in the following manner:

"Form of negotiation and requirements of 'due negotiation.'—(1) A negotiable document of title running to the order of a named person is negotiated by his indorsement and delivery. After his indorsement in blank or to bearer any person can negotiate it by delivery alone.

(2)(a) A negotiable document of title is also negotiated by delivery alone when by its original terms it runs to bearer.  (b) When a document running to the order of a named person is delivered to him the effect is the same as if the document has been negotiated.

(3) Negotiation of a negotiable document of title after it has been indorsed to a specified person requires indorsement by the special indorsee as well as delivery.

(4) A negotiable document of title is 'duly negotiated' when it is negotiated in the manner stated in this section to a holder who purchases it in good faith without notice of any defense against or claim to it on the part of any person and for value, unless it is established that the negotiation is not in the regular course of business or financing or involves receiving the document in settlement or payment of a money obligation.

(5) Indorsement of a nonnegotiable document neither makes it negotiable nor adds to the transferee's rights.

(6) The naming in a negotiable bill of a person to be notified of the arrival of the goods does not limit the negotiability of the bill nor constitute

1. Georgia Code Annotated § 109A–7–102.

2. Georgia Code Annotated § 109A–7–403(1).

notice to a purchaser thereof of any interest of such person in the goods." [3]

Any person who obtains a negotiable warehouse receipt by "due negotiation" obtains substantial rights which are described as follows:

"Rights acquired by due negotiation.— (1) Subject to the following section and to the provisions of 109A–7–205 on fungible goods, a holder to whom a negotiable document of title has been duly negotiated acquires thereby:

(a) title to the document;

(b) title to the goods;

(c) all rights accruing under the law of agency or estoppel, including rights to goods delivered to the bailee after the document was issued; and

(d) the direct obligation of the issuer to hold or deliver the goods according to the terms of the document free of any defense or claim by him except those arising under the terms of the document or under this Article. In the case of a delivery order the bailee's obligation accrues only upon acceptance and the obligation acquired by the holder is that the issuer and any indorser will procure the acceptance of the bailee.

(2) Subject to the following section, title and rights so acquired are not defeated by any stoppage of the goods represented by the document or by surrender of such goods by the bailee, and are not impaired even though the negotiation or any prior negotiation constituted a breach of duty or even though any person has been deprived of possession of the document by misrepresentation, fraud, accident, mistake, duress, loss, theft or conversion, or even though a previous sale or other transfer of the goods or document has been made to a third person." [4]

However, a *non-negotiable* warehouse receipt such as the warehouse receipts involved in this case cannot be "duly ne-

gotiated", as is clearly indicated by the express terms of § 109A–7–502 immediately above quoted.

Robert Braucher in his treatise on warehouse receipts, Documents of Title, § 5.3, at p. 70 (ALI, 1958), states that:

"A non-negotiable document cannot be negotiated; it can only be transferred under this section."

Therefore, there could be no due negotiation of the non-negotiable warehouse receipts involved in this case. More limited rights were acquired by the transferee Bank in this situation, and this is also made clear by the provisions of the Uniform Commercial Code, which provides as follows:

"A transferee of a document, whether negotiable, or nonnegotiable, to whom the document has been delivered but not duly negotiated, acquires the title and rights which his transferor had or had actual authority to convey." [5]

As the Comment of the draftsmen to this section of the Uniform Commercial Code notes:

"It is clear that in the absence of due negotiation a transferor cannot convey greater rights than he himself has, even when the negotiation is formally perfect."

Hence, the plaintiff Bank could obtain no greater rights than Mathis, the Bank's transferor, had authority to convey, and of course, the undisputed evidence in this case shows that Mathis had no authority to convey any rights in the farmers' grain.

The importance of the distinction between a negotiable and a non-negotiable receipt was discussed in Philadelphia National Bank v. Irving R. Boody Co., Inc., 1 UCC 560 (decision of Arbitrator) (1963), where it is said at page 566:

"Throughout the Code there is a clear distinction between negotiable and non-negotiable documents of title, and there are situations where the holder

---

3. Georgia Code Annotated § 109A–7–501.

4. Georgia Code Annotated § 109A–7–502.

5. Georgia Code Annotated § 109A–7–504(1).

to whom a negotiable document has been duly negotiated is in a stronger position than the holder, under otherwise identical circumstances, of a non-negotiable document. For example, under Section 7–502, a holder to whom a negotiable document of title has been duly negotiated acquires thereby (with two exceptions, one of which, relating to fungible goods, is inapplicable, and the other of which will be discussed hereafter), title to the document and title to the goods and certain other rights, whereas under Section 7–504, a transferee of a document, whether negotiable or non-negotiable, to whom the document has been delivered but not duly negotiated, acquires only the title and rights which his transferor had or had actual authority to convey. Due negotiation is the key to this paramount position; but only a negotiable document of title can be negotiated or duly negotiated . . . All of the references in Article 7 to negotiation and due negotiation are limited to negotiable documents."

There are clear risks involved in the acceptance of non-negotiable receipts as collateral security. Professors White and Summers in their treatise Handbook of the Law under the Uniform Commercial Code, point out that:

"The field warehouse lender [here the plaintiff Bank] who acquires non-negotiable receipts incurs all the risks that a lender against negotiable documents incurs and in addition incurs the additional title risks that a party acquiring non-negotiable documents incurs. Generally, so far as the debtor's title is defective, so too is the lender's title defective." Pages 706–707.

■ Since Mathis had no title to the farmers' grain, he could convey no title under the non-negotiable receipts, and when the farmers, the true owners of the receipted grain, received back the grain the rights of the bank against the warehouse company were defeated. The

Bank is left with such remedies as it may have against Mathis, its borrower.

The Bank should have realized that it was incurring a substantial risk of a paramount title in other persons when it accepted the non-negotiable receipts as the sole collateral upon which its loans were based.

Professor Gilmore, in § 6.6 of his work, Security Interests in Personal Property (1965), at page 172, states the rule as follows:

"There is one situation in which it is entirely clear that the warehouseman is not liable to the holders of his receipts. This is when the goods deposited in the warehouse turn out not to have been owned by the borrower-depositor and the circumstances are such that the warehouseman is not chargeable with the knowledge of the depositor's lack of title. This is a situation which arises from time to time in any sort of bailment. Both the Uniform Warehouse Receipts Act and the Uniform and Federal Bills of Lading Acts, codifying the common law rule, provided that the bailee does not warrant the title to the goods covered by the documents he issues; Article 7 of the Code carries the rule forward without change . . . The paramount title of the 'true owner' has not been cut off by the unauthorized bailment or the issuance of documents of title; he may replevy them from the warehouseman or from anyone else who has them. If the warehouseman delivers the goods to the true owner, he is relieved from liability even to a good faith purchaser of negotiable receipts and, a fortiari, from liability to any other sort of receipt holder."

The positions taken by these commentators has been sustained by the Tenth Circuit Court of Appeals in the case of First National Bank of Fleming v. Petzoldt, 262 F.2d 540 (1958), in which the Court held under very similar circumstances that a warehouse company had no liability to the holder of non-negotiable receipts when the true owner re-

ceived back the receipted grain. The Court concluded there that:

"The prima facie case of the receipt holder made by non-delivery is completely overcome by showing that the quantity of fungible goods has been depleted without fault upon the part of the warehousemen." (p. 546)

There has been no evidence in this case to indicate any fault on the part of SLT and the facts of this case would fit within the rule of law laid down by the Court in *Petzoldt*. While it is true that *Petzoldt* is a pre-Uniform Commercial Code case, it is clear under § 7.504(1) of the Uniform Commercial Code that the same rule would still apply. Indeed, the commentators have so concluded. As White and Summers put it at page 703 of their Handbook above cited:

"Where the lender lends against non-negotiable receipts, his security is more precarious . . . This transferee takes the receipts subject to all the possible title infirmities and defenses to which a pledgee of negotiable documents is subject, and he also incurs the risk of infirmities in his own transferor's title. In a pre-code case, First National Bank v. Petzoldt, the true owner of alfalfa seed entrusted it to an elevator company for processing and sale. Instead, the company warehoused the seed and had non-negotiable receipts issued to the bank. When the true owner learned of this, he claimed title to the seed paramount to the bank and prevailed. The result would be the same under the Code, for the elevator company did not have title and therefore could not pass title to bank under 7–504. Moreover, 7–503 does not apply to protect transferees of non-negotiable documents." [6]

Therefore, following the logic of the *Petzoldt* case, the farmers here are the true owners of the grain "whose receipt was rightful as against the claimant" Bank under Georgia Code Annotated § 109A–7–403(1)(a). Thus, the obligation of SLT as bailee and warehouseman was satisfied.

Non-negotiable receipts provided the Bank with an ease and flexibility of procedure which would not have been provided with negotiable receipts, but the Bank should have realized that in accepting non-negotiable receipts it had to rely on the integrity of its borrower. In fact and in law the Bank assumed the risk that Mathis' title was good. It is for this reason that it was incumbent upon the Bank to check Mathis' credit and his grain or to otherwise attempt to perfect a security interest in the grain, none of which was done by the Bank. Indeed, the American Bankers Association has itself indicated the need for such action by a Bank holding non-negotiable receipts by stating:

"Before a field warehouse arrangement is set up, the typical prospective lender investigates the prospective debtor and the prospective collateral." (White and Summers, supra, p. 706, citing American Bankers Association Credit Policy Committee, A Banker's Guide to Warehouse Receipt Financing (1966).

The plaintiff Bank must now bear the consequences of its decision to lend funds to a risky borrower based only on the transfer from him of non-negotiable warehouse receipts. SLT should not bear the burden of the Bank's misplaced business judgment, for the Bank should have known that "a warehouseman does not guarantee title to particular goods received by and receipted for by him." *Petzoldt, supra,* 262 F.2d at p. 546.[7]

---

6. The reference to 7.503 is to a section identical to Georgia Code Annotated § 109A–7–503.

7. There is an additional factor here which should be noted. Not only did the plaintiff Bank fail to look into Mathis' credit rating

and fail to examine the grain when initially making the loans to him, but it continued in its failure after being notified by SLT of the poor risk they considered Mathis to be. Moreover, they continually refused to abide by SLT's judgment that they should require an immediate liquidation, which recommenda-

B. *SLT is not liable for the wrongful taking by Mathis.*

Although what has already been said in this opinion is dispositive of the issue here presented, there is yet another reason for this decision which the Court feels is worthy of comment.

■ The degree of care required of a warehouseman under the Uniform Commercial Code is as follows:

"A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances but unless otherwise agreed he is not liable for damages which could not have been avoided by the exercise of such care." [8]

Stated otherwise, this simply means that the warehouseman owes the duty of ordinary care in protecting the goods from theft or other wrongful taking.

■ We have already described the means used by Mathis to take the grain from the warehouse totally without SLT's knowledge or authority, and since we have already determined that SLT was not negligent in its operation or maintenance of the warehouse, it is clear that SLT can have no liability to the plaintiff Bank for a shortage caused in the way the shortage was caused here. No blame can be ascribed to SLT for Mathis' reprehensible conduct. It would be unfair in the extreme to hold the warehouseman liable for the wrongdoing of another in these circumstances. As one authority has noted:

"A warehouseman is not an insurer against loss of goods by theft and will not be liable for loss of this character in the absence of negligence or other fault." 93 C.J.S. Warehousemen and Safe Depositaries § 45, at p. 469.[9]

SLT having fully satisfied its duty of due care, it can owe no further duty under the circumstances of this case.

C. *The cases cited by Plaintiff have no relevance here.*

In his final argument at the conclusion of the hearing on this matter Plaintiff's counsel cited several cases as authority for Plaintiff's contentions. The Court has given careful consideration to counsel's arguments, but concludes that the cases relied upon have no relevance here. These cases long predated the adoption of the Uniform Commercial Code in Georgia with its clear distinction between negotiable and non-negotiable documents. Moreover, their factual situations are totally unrelated to the one here involved where the rightful owners received back the receipted grain and where a wrongful taking was involved. In addition, the cases cited dealt with negotiable documents, unlike the non-negotiable receipts involved here. Indeed, one case cited by counsel, Consolidated Company v. Citizens Bank, 32 Ga.App. 113, 122 S.E. 732 (1924), presages the provisions of the Uniform Commercial Code which we have heretofore quoted in indicating that the holder of receipts acquires no greater rights than his transferor could convey. As the Court noted in that case:

". . . since the delivery of such a receipt amounts to no more than the delivery of the property which it represents, if a legal title to the receipt is not acquired by the pledgee, he acquires no better title to the property for which it stands, and stands in no better position, than if the pledgor had deposited another's cotton instead of another's warehouse receipt for cotton." (32 Ga.App. at p. 114, 122 S.E. at p. 732.)

The situation discussed there is precisely the one here and gives the Bank as

---

tion was made by SLT at times when there was no shortage. The Bank sat on its rights and negligently failed to pursue remedies which were available and which could have made the Bank whole. Under such circumstances the Bank is not entitled to recover.

8. Georgia Code Annotated § 109A–7–204(1).

9. See also § 7 of the annotation appearing in 13 A.L.R.2d 681.

transferee of the non-negotiable receipts no rights as against the warehouse company.

D. *There is no reason for a judgment against the third party defendant on the third party complaint.*

 Since the Court is holding that SLT has no liability to the Plaintiff in this action, the third party action by SLT against Mathis is moot and there is no necessity for a judgment against Mathis. It is obvious from the facts of this case that Mathis is the wrongdoer and the Plaintiff Bank may wish to pursue Mathis directly, but this is for another day and another lawsuit.

Consistent with the foregoing, the Court concludes that the Plaintiff's action against SLT must fail and the Defendant is entitled to judgment in its favor. Accordingly, it is directed that the Clerk enter judgment in favor of Defendant, SLT Warehouse Company, pursuant to Rule 58 of the Federal Rules of Civil Procedure.