UTAH FARM PRODUCTION CREDIT ASSOCIATION, Plaintiff and Appellant,

v.

A. LaMar HANSEN, et al., Defendants and Respondents.

No. 860047–CA.

Court of Appeals of Utah.

June 9, 1987.

James R. Brown, Jardine, Linebaugh, Brown & Dunn, Salt Lake City, for plaintiff and appellant.

John M. Chipman, Bayle, Hansen, Nelson & Chipman, Salt Lake City, for defendants and respondents.

Before BENCH, GARFF and DAVIDSON, JJ.

## OPINION

DAVIDSON, Judge:

Plaintiff Utah Farm Production Credit Association (PCA) appeals from a special verdict finding that defendant Spanish Fork Livestock Auction (Spanish Fork) did not convert cattle or the proceeds of their sale when it sold cattle in which PCA had a perfected security interest. Plaintiff seeks a reversal of the judgment or, failing that, a new trial. We affirm.

Defendant Hansen and his wife entered into a loan arrangement with plaintiff on June 4, 1979. The purpose was to provide continuous funding for Hansen's ranching operation. In return, Hansen executed security agreements which pledged collateral including livestock and proceeds from their sale. In connection with the loan arrangement, Hansen also executed approved Budget and Cash Flow Projections. These documents projected the income from and expenses of the operation plus the approximate dates of livestock sales. There was no specific requirement that plaintiff's name be placed on any proceeds check. However, plaintiff's "welcoming" letter of June 25, 1979, required that checks from livestock sales "be directly remitted to apply on the loan."[1] The security agreements contained the requirement that Hansen would not dispose of the collateral without the written consent of plaintiff. Plaintiff and Spanish Fork stipulated that PCA properly perfected its security interest in Hansen's livestock by filing with the Secretary of State of the State of Utah.

Hansen complied with the terms of the loan arrangement until January 7, 1981. From that date and continuing until May 12, 1982, Hansen sold cattle through Spanish Fork Livestock Auction on at least nine separate occasions. These sales resulted in gross proceeds of $63,525.43 with the net being paid directly to Hansen. None of these proceeds were paid to plaintiff.

It was the practice of Spanish Fork to rely on "auction letters" from lenders such as plaintiff. These letters provided a list of problem borrowers and requested that auctions make any proceeds checks payable jointly to the secured party and the debtor/seller. On November 17, 1981, PCA sent an "auction letter" concerning Hansen to the auction in Salina but no letter was sent to Spanish Fork. At no time did Spanish Fork contact the Secretary of State, or its successor,[2] to determine if there were financing statements on file which concerned Hansen's livestock. In December, 1983, Hansen and his wife filed for relief under Chapter 7 of the Bankruptcy Code. This action followed with plaintiff attempting to recover the unpaid proceeds from Spanish Fork.

The parties raise the following issues: Did plaintiff give up its security interest through written consent to the livestock's sale or through its course of performance; knowing that livestock auctions rely on "auction letters" is plaintiff estopped from asserting its security interest by not informing Spanish Fork of Hansen's status; and once in the hands of Spanish Fork did the livestock become inventory and the provisions of Utah Code Ann. § 70A–9–307(1) (1980) apply?

Voluminous case law from other jurisdictions can be cited which tends to support the arguments of either side. There is no Utah case law on point but the Utah State Legislature has made its intent known through law enacted subsequent to the trial. It is appropriate to analyze this case under the law presently in effect which we believe reflects both prior and current public policy.

The issue, at its most fundamental level, is who should bear the loss when the debt-

---

**1.** This was a standard letter sent to Hansen and other new accounts after the loans had been made.

**2.** On January 1, 1981, the amendment to Article VII, Constitution of Utah took effect which sub- stituted "Lieutenant Governor" for "Secretary of State." The Division of Corporations and Commercial Code was established within the Department of Business Regulation by legislation enacted in 1984.

or rancher sells his livestock through an auction and then does not remit the proceeds to the secured party. In this case the burden must fall on either PCA or Spanish Fork. Does the lender have the primary burden of protecting itself from unauthorized sales by its debtor? Alternatively, should that burden be placed on auctions to first ascertain whether a security interest exists in the livestock being sold and then to protect the lender from possible default by its borrower? This result could be reached because auctions must be aware that many ranchers have ongoing financial arrangements which create security interests in the rancher's livestock.

The farm products exception to the protection provided to buyers of goods by the Uniform Commercial Code, Utah Code Ann. § 70A–9–307(1) (1980),[3] has proved troublesome in many jurisdictions. See generally Uchtmann, Bauer & Dudek, *The UCC Farm Products Exception—A Time to Change,* 69 Minn.L.Rev. 1315 (1985). Dissatisfaction with the exception, in part, caused Congress to pass the Food Security Act of 1985, P.L. 99–198, § 1324(g), 99 Stat. 1354 (Dec. 23, 1985). In implementing the requirements of this Act, the Utah State Legislature passed Utah Code Ann. § 70A–9–307(4), effective April 28, 1986, which states:

> Notwithstanding Subsection (1) of this section, a secured party may not enforce a security interest in farm products against a buyer, commission merchant, or selling agent who purchases or sells farm products in the ordinary course of business from or for a person engaged in farming operations unless the secured party has complied with the rules issued by the director of the Division of Corporations and Commercial Code under authority granted by § 70A–9–400.

Section 70A–9–400 (1986) requires:

> The director of the Division of Corporations and Commercial Code from time to time shall issue such rules as are necessary to implement a *central filing system* which will conform to the require-

ments of the Food Security Act of 1985,.... (Emphasis added).

To perfect its security interest in farm products, the lender must now accomplish two separate filings with the Division of Corporations and Commercial Code of the Department of Business Regulation. The first is pursuant to Utah Code Ann., Title 70A, Chapter 9 and is the filing normally made for non-farm products secured transactions. The other filing is in accordance with the specific requirement of Utah Code Ann. § 70A–9–400 (1986) and is made with the central filing system. Buyers, commission merchants, and selling agents may also register with the central filing system and should do so to protect themselves. By registering with the central filing system, buyers, commission merchants or selling agents are made aware of security interests in the farm products with which they are dealing by being sent a semi-monthly report of security interests filed in the central system. It then is a simple matter to make out any proceeds check in the names of both the debtor/seller and the secured party/lender. The secured party is also required to file updates for any changes in the security agreement so the auction has current information.

If the secured party makes the two filings described above, the provisions of § 70A–9–307(4) are effective and the security interest may be enforced against the buyer, commission merchant or selling agent. If the secured party does not make the § 70A–9–400 filing with the central system then that secured party cannot enforce the security interest against the buyer of the farm products or against the commission merchant or selling agent through which the sale is conducted. The obvious intent of this legislation is to lessen the impact of the farm products exception.

In *U.S. v. Progressive Farmers Marketing Agency,* 788 F.2d 1327 (8th Cir.1986), that court was faced with substantially the same situation as in the instant case. There a farmer's creditor brought a conversion action against a selling agent for the value of hogs sold through the agent who

---

**3.** This was the law in effect at the time this case arose.

was not aware of the security interest. The district court held for the creditor but the circuit court reversed citing a newly amended Iowa statute which relieved the selling agent of liability unless it had received prior written notice of the security interest or did not comply with certain geographic requirements not appropriate to the instant case. The circuit court wrote:

> Although the revised statute may not be applicable in this case because the statute became effective after the district court had rendered its opinion, there can be little doubt that these changes reflect the prevailing public policy of the State of Iowa.... These changes have been brought about because of the problems caused by the farm products exception and the need to provide greater protection to the buyers of farm products. These statutes eliminate the harsh result contemplated by the district court of transforming buyers and commission merchants into sureties on the farmers' debts.

*Id.* at 1330.

The circuit court went on to discuss the intent of Congress in the Food Security Act of 1985 and that the loss resulting from a borrower's default was to be placed on the lender subject to the provisions of the central filing system.

We believe the public policy of Utah requires plaintiff lender to bear the loss in this case. The lender should be motivated to protect itself and is in a superior position to do so. The lender sets the conditions of security and repayment of the loan at the time the loan is made.

Livestock auctions typically process large numbers of sales on a daily basis. They are selling agents so the buyers pay the auction which then pays the seller after retaining a sales commission. The problems of handling a large number of checks, of checking brands with the brand inspector, and moving the livestock through the auction make it impossible to check with the requisite state agency for each seller.[4] The auction is also under a duty under federal law[5] to make prompt payment for livestock.

To hold the unsuspecting auction responsible for losses to secured parties caused by the subsequent actions of sellers is unacceptable. The enactment of Utah Code Ann. § 70A–9–307(4) in 1986, simply recognized the existing public policy and put in place a mechanism to protect all parties. Under the old policy as well as under the current law, plaintiff lender must bear the risk of loss unless the auction is given notice. Because of this, it is not necessary to address the specific issues raised by the parties which might not be applicable today.

The judgment of the district court is affirmed.

BENCH and GARFF, JJ., concur.

---

4. As the system now exists, the auction receives a microfiche twice monthly with current information. The auction need only check the microfiche prior to making out the check. This eliminates the need to telephone the state agency for each seller.

5. 7 U.S.C. § 228b (1980). The Packers and Stockyards Act requires payment by the close of the next business day.