MICHIGAN NATIONAL BANK v MICHIGAN LIVESTOCK
EXCHANGE

Docket No. 81932. Argued November 2, 1988 (Calendar No. 7). Decided May 1, 1989.

Michigan National Bank brought an action for conversion in the Tuscola Circuit Court against Michigan Livestock Exchange, seeking the proceeds of an auction of livestock owned by William and Rosemary Christacopulos which had been pledged as collateral to the bank for loans made to them and their partnership, Trojan Farms. The court, Patrick R. Joslyn, J., granted summary judgment for the plaintiff on the ground that the defendant failed to state a valid defense. The Court of Appeals, Danhof, C.J., and Bronson and Michael J. Kelly, JJ., ordered remand to the trial court for consideration of the applicability of MCL 440.7404; MSA 19.7404. On remand, the trial court concluded that the statute did not apply and again granted summary judgment for the plaintiff. The Court of Appeals, Danhof, C.J., and MacKenzie and J. P. Swallow, JJ., reversed in an opinion per curiam, holding that the statute shielded the defendant from liability (Docket No. 92221). The plaintiff appeals.

In an opinion by Justice Brickley, joined by Justices Levin, Cavanagh, Boyle, and Archer, the Supreme Court held:

Neither MCL 440.7404; MSA 19.7404 nor MCL 440.9307; MSA 19.9307 shields the defendant in this case from liability.

1. Under common law, an auctioneer who takes possession of property, sells it, and pays over the proceeds, less commission, is liable for conversion, even though the auctioneer has no knowledge of want of title in the party for whom the property is sold and acts in good faith. Article 7 of the UCC provides bailees with immunity from liability for conversion where the defendant is a bailee for purposes of Article 7, the goods were disposed of pursuant to a document of title, and the defendant acted in good faith, including observation of reasonable com-

References

Am Jur 2d, Auctions and Auctioneers § 69.
Personal liability of auctioneer to owner or mortagee for conversion. 96 ALR2d 208.

mercial standards. In this case, the defendant neither was a bailee under Article 7, nor did it dispose of the livestock pursuant to a document of title.

2. Under Article 7, a bailee, by means of a warehouse receipt or other document of title must acknowledge possession of goods and contract to deliver them. "Goods" includes all things which are treated as movable for the purposes of a contract of storage or transportation. In order for the livestock in this case to be considered "goods," it must be dealt with pursuant to a contract for storage or transportation. Because the defendant is an auctioneer and only incidentally stored the livestock pursuant to a contract for commission sale, it is not a bailee for purposes of Article 7.

3. The term "document of title" includes warehouse receipts or other documents which in the regular course of business or financing are treated as adequately evidencing that the person in possession is entitled to receive, hold, and dispose of the document and the goods it covers. To be a document of title, a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession. The trucker's receipt offered by the defendant was not a document of title under Article 7; it was not the type of document intended by the provision, and it did not serve the essential function which documents of title perform, viz., to define to whom delivery is to be made.

4. The version of MCL 440.9307; MSA 19.9307 in effect at the time of the transaction in this case does not shield the defendant from liability. Its subsequent revision, which pertains to buyers in the ordinary course of business, does not apply in this case.

Chief Justice RILEY, joined by Justice GRIFFIN, concurring, stated that while Articles 7 and 9 of the Uniform Commercial Code do not protect the exchange from liability for conversion of the debtor's livestock, the majority erred in not addressing the classification of the livestock as either farm products or inventory for purposes of Article 9. This Court should classify livestock in the hands of an auctioneer as farm products and not inventory. In addition, the revised version of § 9-307 supports the conclusion that under Michigan law livestock owned by a debtor and temporarily in the hands of an auctioneer is to be classified as farm products and not inventory. If the Legislature intended to classify collateral in the temporary possession of an auctioneer as inventory, it could have done so rather than specifically referring to the collateral as farm products. In this

case, the livestock should be classified as farm products and not inventory for purposes of Article 9.

Reversed and remanded.

165 Mich App 243; 418 NW2d 663 (1987) reversed.

AUCTIONS AND AUCTIONEERS — BAILMENTS — SECURED TRANSACTIONS — CONVERSION.

An auctioneer, who took possession of certain pledged livestock, sold it, and paid over the proceeds, and who did not qualify as a bailee under Article 7 of the Uniform Commercial Code nor as a buyer in the ordinary course of business under Article 9, was liable for conversion under Michigan common law even though it had no knowledge of any want of title in the party for whom it sold the livestock and acted in good faith (MCL 440.7404, 440.9307; MSA 19.7404, 19.9307).

*David J. Vigna* for the plaintiff.

*E. Lawrence Oldfield, Joseph T. Collison,* and *James T. Malysiak* for the defendant.

Amicus Curiae:

*Warner, Norcross & Judd* (by *James H. Breay*) for Michigan Bankers Association.

BRICKLEY, J. In this action for conversion, defendant claims that as a matter of law it is shielded from liability by UCC 7-404[1] or, in the alternative, by UCC 9-307[2] when read in conjunction with 1 Restatement Torts, 2d, § 233(1). The Court of Appeals entered summary judgment in defendant's favor on the basis of UCC 7-404.

We hold that § 7-404 does not apply to the defendant, and we reject the latter defense as it is based upon a misapplication of the Restatement provision. We therefore reverse the decision of the Court of Appeals.

---

[1] MCL 440.7404; MSA 19.7404.

[2] MCL 440.9307; MSA 19.9307.

I

In 1978 and 1981, plaintiff, Michigan National Bank, made loans to farmers William and Rosemary Christacopulos and their co-partnership, Trojan Farms. The collateral for these loans included "all livestock and increase" of the farmers. The bank filed its security interest with the county, but not with the Secretary of State.

In 1982, the farmers had the defendant Livestock Exchange auction some of the cattle which it had pledged to the bank as collateral. Defendant made no attempt to search the county or state records for a UCC filing. The payment for the cattle, less sales commission, was made solely to the farmers.

Plaintiff filed a complaint for conversion against the exchange on January 24, 1983. Defendant filed its answer on March 17, 1983. Plaintiff filed a motion for summary judgment under GCR 1963, 117.2(2) and (3) (now MCR 2.116[C][9] and [10]), on the grounds that defendant had failed to state a valid defense and that there was no genuine issue of material fact. After a hearing on the matter, the trial court granted summary judgment on the ground that the exchange had failed to state a valid defense.

Defendant appealed and the Court of Appeals remanded to the trial court

> for consideration of the applicability and effect of § 7-404 of the Uniform Commercial Code to and upon this case, and such amendments to the pleadings as may be necessary to raise and consider this issue . . . . See *United States v Hext,* 444 F2d 804; 9 UCC Rep 321 (CA 5, 1971). [Order of the Court of Appeals, entered on September 28, 1984 (Docket No. 78496).]

On remand, the trial judge concluded that UCC 7-404 did not apply in this case, and he reëntered summary judgment in plaintiff's favor. The case was again appealed, and this time the Court of Appeals reversed and entered summary judgment in favor of defendant, holding that § 7-404 shielded the defendant from liability. Many cases cited and discussed by the defendant in its Court of Appeals brief addressed not § 7-404, but UCC 9-307. It is likely that defendant saw fit to do so since the Court of Appeals, in its remand order, had cited *United States v Hext,* 444 F2d 804; 9 UCC Rep 321 (CA 5, 1971), which, although it addressed § 7-404, relied upon § 9-307. In a footnote, the Court of Appeals noted this and stated:

> The order of summary disposition in the bank's favor was entered solely on the basis of UCC § 7-404. For that reason and because we find that the exchange is entitled to the immunity afforded by that section, it is unnecessary to address issues involving UCC § 9-307 and other code provisions. [165 Mich App 243, 250, n 2; 418 NW2d 663 (1987).]

Plaintiff appealed from the Court of Appeals decision, and this Court granted leave to determine "whether the trial court erred in granting the plaintiff's motion for summary disposition." 430 Mich 858-859 (1988).

II

Michigan common law has long held that "where an auctioneer receives and takes . . . property into his possession, and sells it, paying over the proceeds, less his commission, he is liable, although he has no knowledge of want of title in the party for whom he sells, and acts in good

faith." *Kearney v Clutton,* 101 Mich 106, 111; 59 NW 419 (1894). See also *Sunlin v Skutt,* 133 Mich 208, 211; 94 NW 733 (1903); cf. *Trail Clinic v Bloch,* 114 Mich App 700; 319 NW2d 638 (1982); *Willis v Ed Hudson Towing,* 109 Mich App 344; 311 NW2d 776 (1981) (good faith is not a defense in a suit for conversion). This common-law rule is also followed in the great majority of jurisdictions.[3] Defendant has not requested that we revise this common-law approach, nor for reasons which will be discussed below, n 19, would we choose to do so in this case.

Defendant and the Court of Appeals accordingly rely on § 7-404 of the Uniform Commercial Code for the view that plaintiff has no claim against the defendant. This provision provides bailees with

---

[3] The great weight of authority follows the rule that a sale by an auctioneer for a principal who has no title to the property or who holds it subject to a mortgage or other lien, or who for other reasons has no right to dispose of it, entails liability to the true owner, lienor, or conditional vendor, as for a conversion . . . notwithstanding the auctioneer acts without knowledge of the principal's lack of authority to sell. [Anno: *Personal liability of auctioneer to owner or mortgagee for conversion,* 96 ALR2d 208, 210.]

Similarly, 7 Am Jur 2d, Auctions and Auctioneers, § 69, pp 420-421, provides in pertinent part:

An auctioneer who sells property in behalf of a principal having no title thereto is personally liable to the true owner for conversion, *regardless of whether he had notice of the true owner's title,* or whether he acted with the utmost good faith in total ignorance thereof . . . .
The rule of liability on the part of the auctioneer applies . . . in some cases, where the auctioneer, even though *without actual knowledge of the security interest, sells goods subject to a security interest at the instance of the borrower.*

We know of only three states which do not follow the majority approach: Nebraska by statute, Rev Stat Nebraska, § 69-109.01, and Mississippi and Tennessee by common law. *Dixie Stock Yard v Ferguson,* 192 Miss 166; 4 So 2d 724 (1941); *Frizzell v Rundle,* 88 Tenn 396; 12 SW 918 (1890).

immunity from liability for conversion where certain conditions are met. The section provides:

> A bailee who in good faith including observance of reasonable commercial standards has received goods and delivered or otherwise disposed of them according to the terms of the document of title or pursuant to this Article is not liable therefor. This rule applies even though the person from whom he received the goods had no authority to procure the document or to dispose of the goods and even though the person to whom he delivered the goods had no authority to receive them.

The parties agree that this provision can shield the defendant only if three conditions are met:

1) The defendant is a bailee for purpose of Article 7;

2) The defendant disposed of the cattle pursuant to a document of title;[4]

3) The defendant acted in good faith, including the observation of reasonable commercial standards.

Because we conclude that defendant does not meet the first two of these requirements for § 7-404 protection, we do not reach the question whether defendant acted in good faith and followed reasonable commercial standards.

A

"Bailee" as it is used in Article 7 is defined in § 7-102(a), which provides:

> "Bailee" means the person who by a warehouse

---

[4] Section 7-404 does not require the use of a document of title if the disposition of the goods was nevertheless "pursuant to this article." Defendant has not argued this point, nor have we discovered any basis for concluding that the cattle were so disposed in this case.

receipt, bill of lading or other document of title acknowledges possession of goods and contracts to deliver them.

Thus, in order to fall within this definition, the bailee must:
1) by *a warehouse receipt or other document of title*
2) acknowledge possession of *goods* and
3) *contract to deliver them.*

"Goods," according to § 7-102(f), means:

all things which are treated as movable for the purposes of a contract of storage or transportation.

Therefore, for the cattle to be considered "goods" for purposes of Article 7, they must be dealt with pursuant to "a contract for storage or transportation." This is consistent with the requirement that the bailee "contracts to *deliver*" the "goods," as well as with Article 7's definition of warehouseman in § 7-102(h), which provides:

"Warehouseman" is a person engaged in the business of storing goods for hire.

The essential determination which we must make is whether the defendants and the farmers entered into a contract for storage or transportation. If not, the cattle are not "goods," and thus the defendant is not a bailee. Defendant argues that it did enter into a contract for storage and transportation, claiming that it earns its commission not only by auctioning cattle, but also by holding, feeding, and watering them before and after auction.

It is uncontested that defendant provides storage and transportation as part of its service. However,

these activities are incidental to the primary service provided by the defendant—that of an auction or commission merchant. It would strain the meaning and scope of Article 7 to include in it all parties who engage in some element of storage or transportation as required to carry out their primary task. Similarly, while the cattle were stored in the course of the execution of the contract for commission sale, it is inaccurate to say that they were treated pursuant to "a contract of storage or transportation."

In their UCC treatise, Professors White and Summers have observed:

> Article Seven is unlike Article Two on sales and Article Nine on secured transactions where freedom of contract is the rule rather than the exception. The paucity of free contract under Article Seven can be readily explained. *The Article deals with two ancient common callings, namely storage and transport.* [2 White & Summers, Uniform Commercial Code (3d ed), § 21-2, p 135. Emphasis added.]

The defendant's activities as a commission merchant sometimes require it to store and deliver livestock. However, that is not to say that such activities are the "calling" of a business whose essential work is to act as a commission sales agent.

Speaking directly about § 7-404, White and Summers have also written:

> In a batch of cases, courts have considered whether 7-404 immunizes auctioneers, brokers, and the like who unknowingly assume control of stolen goods or goods subject to security interest, all in the course of participating in their resale. We do not think 7-404 was meant to apply here to

immunize such persons from conversion liability.
[2 White & Summers, Uniform Commercial Code
(3d ed), p 148, n 50. Citations omitted.][5]

Defendant has not suggested that it is generally
in the business of storing goods or that it would
provide such storage absent a contract for auction.
We recognize that there is a common-law category
of "bailment for sale."[6] However, such activities
have been governed by the laws of agency rather
than bailment.[7] In no auction cases decided under
the common law by Michigan courts have bail-
ment principles been utilized. See, e.g., *Ives v
Tregent,* 29 Mich 390 (1874); *Mercer v Leihy,* 139
Mich 447; 102 NW 972 (1905).

---

[5] The official comment to § 7-404 also indicates that a narrow
construction is appropriate:

> [T]he common law rule of "innocent conversion" by
> unauthorized "intermeddling" with another's property is inap-
> plicable to *the operations of commercial carriers and ware-
> housemen,* who in good faith and with reasonable observance of
> commercial standards perform obligations which they have
> assumed and which *generally they are under a legal compul-
> sion to assume.* The section applies to delivery to a fraudulent
> holder of a valid document as well as to delivery to the holder
> of an invalid document. [Emphasis added.]

Defendant claims that it fits within the definition of "warehouse-
man." However, defendant is not "in the business of storing goods for
hire."

[6] See 8 CJS, Bailments, § 11, p 234.

[7] A common-law bailments treatise stated:

> The right, duties, and responsibilities of factors . . . more
> properly belong to a treatise on agency. [Hale, Handbook on
> the Law of Bailments and Carriers, § 45, p 251.]

See also 8 CJS, Bailments, § 11, p 234:

> There is a bailment *or agency* to sell on consignment where
> goods are delivered by one person to another to be sold on
> behalf of, and with title retained in, the former, and the latter
> is liable only to account for the proceeds. [Emphasis added.]

See also Reuschlein & Gregory, Agency & Partnership, ch 2, § 18,
pp 46-47.

Defendant is an auctioneer and only incidentally stores livestock pursuant to contracts for commission sale. We therefore conclude that it is not an Article 7 bailee.

### B

We also reject defendant's contention that the "trucker's receipt" employed in the transaction was a document of title. While the record and briefs do not clearly define how this receipt is used, it appears that when livestock are delivered to the exchange, the exchange issues a document which identifies the animals' owner, the trucker making delivery, and the trucking charges. A copy is given to the trucker. The receipt also identifies the stock by number, type, and weight. After a sale occurs, the exchange records on the trucker's receipt the purchase price, the name of the buyer, and the amount of the commission due. Copies are then apparently provided to the buyer and seller. A document of title is defined in UCC 1-201(15),[8] which reads:

> "Document of title" includes bill of lading, dock warrant, dock receipt, warehouse receipt, or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold, and dispose of the document and the goods it covers. To be a document of title a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

Defendant argues that the trucker's receipt is

[8] MCL 440.1201(15); MSA 19.1201(15).

either a warehouse receipt or falls within the
broader "any other document" language of the
provision.

In light of our conclusion that defendant is not
in the business of storing goods for hire, we reject
the contention that the trucker's receipt is a ware-
house receipt. Section 1-201(45)[9] defines warehouse
receipt:

> "Warehouse receipt" means a receipt issued by a
> person engaged in the business of storing goods for
> hire.

We also note that UCC 7-202(2)[10] suggests that a

[9] MCL 440.1201(45); MSA 19.1201(45).

[10] MCL 440.7202(2); MSA 19.7202(2) provides:

> Unless a warehouse receipt embodies within its written or
> printed terms each of the following, the warehouseman is liable
> for damages caused by the omission to a person injured
> thereby:
> (a) the location of the warehouse where the goods are stored;
> (b) the date of issue of the receipt;
> (c) the consecutive number of the receipt;
> (d) a statement whether the goods received will be delivered
> to the bearer, to a specified person, or to a specified person or
> his order;
> (e) the rate of storage and handling charges, except that
> where goods are stored under a field warehousing arrangement
> a statement of that fact is sufficient on a non-negotiable receipt;
> (f) a description of the goods or of the packages containing
> them;
> (g) the signature of the warehouseman, which may be made
> by his authorized agent;
> (h) if the receipt is issued for goods of which the warehouse-
> man is owner, either solely or jointly or in common with
> others, the fact of such ownership; and
> (i) a statement of the amount of advances made and of
> liabilities incurred for which the warehouseman claims a lien
> or security interest (section 7209). If the precise amount of such
> advances made or of such liabilities incurred is, at the time of
> the issue of the receipt, unknown to the warehouseman or to
> his agent who issues it, a statement of the fact that advances
> have been made or liabilities incurred and the purpose thereof
> is sufficient.

trucker's receipt is not a warehouse receipt. This provision lists necessary provisions of such a receipt.[11] Two important elements listed in § 7-202 are missing from the trucker's receipt. First, the trucker's receipt does not contain a "statement whether the goods received will be delivered to the bearer, to a specified person, or to a specified person or his order." Second, it does not provide "the rate of storage and handling charges." The auctioneer's fee, if it can be considered "storage and handling charges" at all, is entered only after the sale since it is done on a commission basis. More important, however, is the fact that the document does not state who is to receive the goods. At most, it could be said that the exchange, as bailee, issues its own delivery order,[12] but by definition, the delivery order must come from the bailor.

We also reject defendant's contention that the trucker's receipt is a form of a document of title other than a warehouse receipt. The final sentence of § 1-201(15) provides:

> *To be a document of title a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession* which are either identified or are fungible portions of an identified mass. [Emphasis added.]

The emphasized portion of this provision makes

[11] Under the Uniform Warehouse Receipts Act, 3 ULA 1 (1959), if a purported warehouse receipt did not contain all the elements listed, it was deemed void. This led to bad results because minor technical errors in the document could void an entire transaction. Under § 7-202 a failure to include all the necessary elements does not render the document void, but instead makes the warehouseman liable for any damages caused by the omission. Therefore, although the lack of some elements listed in § 7-202 does not automatically mean that the receipt cannot be a document of title, we think it reasonable to compare these elements and the trucker's receipt to try to determine the nature of the document.

[12] See discussion below, p 291.

clear that the trucker's receipt cannot be deemed a document of title unless it covers goods in a *bailee's* possession.[13] We have already determined that defendant is not a bailee. However, even putting that fact aside, we would still conclude that the receipt is not a document of title.

Defendant relies on the broadest language in the § 1-201(15) definition, viz.,

> also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold, and dispose of the document and the goods it covers.

It is clear that the drafters intended to leave this provision open-ended so that changes in technology could be accommodated. The official comment refers to the open-ended nature of the definition:

> [T]he definition is left open so that new types of documents may be included. It is unforeseeable what documents may one day serve the essential purpose now filled by warehouse receipts and bills of lading. Truck transport has already opened up problems which do not fit the patterns of practice resting upon the assumption that a draft can move through banking channels faster than the goods themselves can reach their destination. There lie ahead air transport and such probabilities as teletype transmission of what may some day be regarded commercially as "Documents of Title."

While the code provided for the likelihood that new types of documents of title would be developed, we do not believe that the document in this case is such an example. The open definition does

---

[13] The official comment to this provision states that the provision "make[s] it explicit that the obligation or designation of a third party as 'bailee' is essential to a document of title . . . ."

not purport to convert commission sales contracts into documents of title. It merely recognizes that with changes in technology, new and unforeseeable types of documents of title could yet develop. Moreover, defendant has provided no information which would lead us to believe that this type of receipt was not already in use at the time the UCC was adopted. While the definition was designed so as to not exclude newly developing forms of documents of title, we do not think it was intended to provide for a reclassification of documents already in use, absent a change in commercial practices.

In addition, the receipt does not serve the essential function which documents of title perform, viz., to define to whom delivery is to be made. Section 7-403(1)[14] requires that delivery be made to "a person entitled under the document . . . ."[15] Such a person is

> [a] holder in the case of a negotiable document, or the person to whom delivery is to be made by the terms of or pursuant to written instructions under a non-negotiable document. [MCL 440.7403(4); MSA 19.7403(4).]

Thus, where the document is negotiable, it must be presented to the bailee in order to take delivery since delivery must be made to the bearer of the document. Obviously, the trucker's receipt is not a negotiable document of title since it does not state that delivery is to be made to the bearer as required by UCC 7-104(1). The exchange accordingly claims that the receipt is a nonnegotiable docu-

---

[14] MCL 440.7403(1); MSA 19.7403(1).

[15] See *Teague Bros Transfer & Storage Co v Kinloch,* 441 So 2d 968 (Ala, 1983); *Bishop v Allied Van Lines,* 80 Ill App 3d 306; 399 NE2d 698 (1980); *Turner v Scobey Moving & Storage Co,* 515 SW2d 253; 15 UCC Rep 1122 (Tex, 1974); 7 Hawkland, Uniform Commercial Code Series, § 7-403:02, pp 254-255.

ment of title. However, nonnegotiable documents of title must either explicitly state who is to receive the goods or the goods remain deliverable to the bailor only, in which case the bailor may at any time issue a "delivery order" in writing to the bailee stating who is to receive the goods or a portion of them.[16] A "delivery order" is a document of title in its own right.[17] No one was named in the trucker's receipt when defendant issued it, and the bailor never provided a delivery order. Therefore, if we view the receipt as a document of title, the only parties entitled to receive the cattle were the bailor farmers.

Defendant argues that the trucker's receipt defines who is to receive the goods by its implied terms. However, these very implied terms, viz., that the exchange is to act as a commission merchant and auction them to the highest bidder, demonstrate that the trucker's receipt is not a document of title. To the degree that the defendant claims that the "person entitled" is whomever the exchange negotiates a sale to, the exchange has exceeded the duties of a UCC bailee.

In light of the above discussion, we conclude that the trucker's receipt was not a document of title under Article 7.

### III

Defendant cites no cases which have held that § 7-404 shields auctioneers from liability for conversion. Further, it cites no cases in which auctioneers were held to be bailees for purposes of any provision of Article 7.

---

[16] See, generally, Alderman, A Transactional Guide to the Uniform Commercial Code, ch 2; Riegert & Braucher, Documents of Title (3d ed), pp 13-15, 28-29, 64-65, 82-97 and 126-129.

[17] MCL 440.1201(15); MSA 19.1201(15).

The only authority which defendant cites for its view is 7 Anderson, Uniform Commercial Code, § 7-404:3, p 583, which states:

Code § 7-404 destroys the common law tort liability of one innocently selling or handling the goods of another.[19] As long as the bailee acts innocently he is not liable to the true owner for a conversion of the latter's goods in the case here considered.

---

[19] See [Official Code Comment] § 7-404:1.

---

This commentary is of doubtful relevance for two reasons. First, it relies on the official comment which, as we have explained, n 5 *supra,* speaks only of warehousemen and common carriers as being within the scope of the provision. Second, defendant's reading of the Anderson treatise is questionable in light of other commentary provided in that treatise. In its discussion of UCC 9-306,[18] the treatise states:

When an auctioneer sells property in which a creditor has a perfected security interest without the permission of the creditor, the auctioneer is liable for conversion of the collateral even though he had acted in good faith and without knowledge of the existence of the security interest. Such liability is a continuation of prior non-Code law and is not displaced by the fact that the Code contains no provision on the subject of the liability of third persons to the secured creditor. [9 Anderson, Uniform Commercial Code, § 9-306:55, p 179.]

Defendant also relies on *United States v Hext, supra.* That case primarily addressed Article 9 and will be discussed below, pp 296-301. Defendant's

---

[18] MCL 440.9306; MSA 19.9306.

reliance on it vis-à-vis Article 7 is misplaced. In *Hext,* the commission sales agent and the bailee were two distinct entities. The *Hext* court held, on the basis of its somewhat attenuated reading of Article 9, that the sales agent was not liable. In footnote 34 the court noted that while the Article 9 analysis would shield the sales agent, it would not do the same for the bailee. The note then stated that the bailee "is otherwise protected from conversion liability by 7-404 . . . ." Therefore, defendant's citation to *Hext* is misleading on two levels. First, while *Hext* correctly stated that a bailee is shielded by § 7-404, the bailee in that case was an ordinary warehouseman, not a sales agent. Second, since the *Hext* court relied on Article 9 rather than Article 7 to find in favor of the sales agent, it would seem that it did not believe that sales agents are shielded by § 7-404. If that were so, the attenuated Article 9 analysis would not have been necessary.

While there is little case law interpreting § 7-404, what there is supports plaintiff's position. *First Nat'l Bank of LeCenter v Farmers Union Marketing & Processing Ass'n,* 371 NW2d 22 (Minn App, 1985); *United States v New Holland Sales Stable, Inc,* 603 F Supp 1379 (ED Pa, 1985). Cf. *Turner v Scobey Moving & Storage Co,* 515 SW2d 253; 15 UCC Rep 1122 (Tex, 1974); *Bishop v Allied Van Lines,* 80 Ill App 3d 306; 399 NE2d 698 (1980). Further, we are aware that in interpreting the UCC, courts should attempt to promote uniformity. *United States v Burnette-Carter Co,* 575 F2d 587 (CA 6, 1978). In addition, there are many cases in which the common-law rule of auctioneer liability was followed after the adoption of the UCC. *United States v Burnette-Carter Co, supra; United States v Topeka Livestock Auction, Inc,* 392 F Supp 944 (ND Ind, 1975); *In re Van Rhee,* 80

Bank Rptr 844 (WD Mich, 1987); *United States v Chesley's Sales, Inc,* 523 F Supp 528 (WD Pa, 1981); *Commercial Bank at Alma v Hales,* 281 Ark 439; 665 SW2d 857 (1984); *Hills Bank & Trust Co v Arnold Cattle Co,* 22 Ill App 3d 138; 316 NE2d 669 (1974); *Top Line Equipment Co v Nat'l Auction Service, Inc,* 32 Wash App 685; 649 P2d 165 (1982); *Bottema v Producers Livestock Ass'n,* 174 Ind App 206; 366 NE2d 1189 (1977); *Farmers State Bank v Stewart,* 454 SW2d 908 (Mo, 1970). In *Stewart,* p 915, n 5, the Missouri Supreme Court took specific note of the fact that the defendant was not an ordinary bailee, stating:

> The action of the sales barn operator in the case at bar went beyond taking charge of the cattle as a mere depositary. The defendant Stewart took charge of the cattle with the intention of handling them in such a way—namely, by selling them— that some third person would acquire a proprietary interest in them. This is a serious invasion of the rights of the lienholder.

In light of our conclusion that the defendant is not an Article 7 bailee and that the trucker's receipt is not a document of title, as well as the lack of any authority supporting defendant's position, we hold that UCC 7-404 does not apply to the defendant.

IV

Both parties, as well as the amicus curiae, discuss the effect of UCC 9-307 on the question of defendant's liability. While the Court of Appeals based its decision on § 7-404, it invited the discussion of § 9-307 by citing *Hext, supra,* which relied on that provision. Since the issue was raised and preserved, and we did not limit our grant order to

§ 7-404 alone, we will, in the interests of judicial economy, forgo a remand to the Court of Appeals and address the Article 9 issue.

There are two possible grounds for affirmance of summary judgment in favor of the defendant on the basis of § 9-307. The first relies on the statute in effect at the time of the transaction as read in the context of 1 Restatement Torts, 2d, § 233(1). The second suggests that policies underlying the revised version of § 9-307, which was not in effect at the time this suit arose, should be applied to this case.

A

Section 233(1) of the Restatement of Torts, 2d, p 453, reads as follows:

Except as stated in Subsection (4), one who as agent or servant of a third person disposes of a chattel *to one not entitled to its immediate possession* in consummation of a transaction negotiated by the agent or servant, is subject to liability for a conversion to another who, as against his principal or master, is entitled to the immediate possession of the chattel. [Emphasis added.]

The defendant's argument focuses on the emphasized phrase. Defendant claims that under the Restatement's version of this common-law principle, if the party who purchased the cattle was in fact "entitled to [their] immediate possession," then there is no conversion and the defendant is not liable.

In order to demonstrate that the purchaser was in fact entitled to the immediate possession of the cattle, defendant then cites UCC 9-307(1), which provided:

> A buyer in ordinary course of business (subsection [9] of section 1-201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

This provision is an exception to the general rule stated in § 9-306(2), which provides:

> Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale . . . unless the disposition was authorized by the secured party . . . .

Thus, the general rule is that a security interest remains with collateral even though it is no longer owned by the debtor, but, pursuant to § 9-307, if the new owner of the collateral is a "buyer in the ordinary course of business" he takes free of the security interest *unless the collateral is "farm products [bought] from a person engaged in farming operations . . . ."*

Rather than decide the more difficult question of whether the cattle were farm products or inventory, we will assume, for the purpose of argument, defendant's view that they were inventory when auctioned by the exchange. Therefore, defendant suggests, since the purchasers took free of the bank's security interest, they were entitled to immediate possession and the agent, i.e., the exchange, is not liable for conversion.

This analysis was first defined in *United States v Hext, supra.* In that case, the debtor had pledged cotton as collateral for loans from the plaintiff's creditor. The cotton was stored with a bailee and sold through a separate sales agent. Quoting § 233(1), the *Hext* court stated:

Accepting this as an authoritative statement of the law (and none of the other authorities cited by the parties are to the contrary),[35] it is at once apparent that [the sales agent and the bailee], to the extent that they acted, in good faith and without actual knowledge of the Government's interest, as agents of the Gin Co. by facilitating the sale of the cotton to the buyers, cannot be liable as converters since the cotton was not transferred "to one not entitled to its immediate possession." Rather, since the buyers took free of the Government's security interest under Section 9-307(1) of the Code, they were entitled to immediate possession, and the acts of [the sales agent and bailee] in facilitating the transfer to them were thus not tortious.

---

[35] For example, the Government quotes Dean Prosser's statement that "[p]erhaps the most common way in which conversion is committed is by an unauthorized transfer or disposal of possession of goods *to one who is not entitled to them.*" Prosser, Torts, § 15, at 87-88 (3d ed, 1964) (emphasis added).

---

[444 F2d 816.]

Defendant notes that this approach has also been followed in *United States v Muleshoe Livestock Auction,* unpublished opinion of the United States District Court for the Northern District of Texas, decided April 25, 1988 (Docket No. CA-2-83-149). See also *United States v Progressive Farmers Marketing Agency,* 788 F2d 1327 (CA 8, 1986).

We reject this analysis for two reasons. First, the Restatement provision, as interpreted by the defendant, does not accurately represent Michigan common law. As noted above, that rule was stated in *Kearney v Clutton,* 101 Mich 111:

[W]here an auctioneer receives and takes . . . property into his possession, and sells it, paying over the proceeds, less his commission, he is liable, although he has no knowledge of want of title in the party for whom he sells, and acts in good faith.

Assuming arguendo that the Restatement means what defendant says it does, stare decisis nevertheless compels our reliance on *Kearney*.[19]

Even if we were to rely on the Restatement provision rather than our own common law, we would nevertheless reject it because the analysis which defendant derives from it and § 9-307 rests on bootstrap reasoning. One commentator has observed that the *Hext* analysis "is suspect":

> [The *Hext* court] correctly observed that there can be no conversion liability for having disposed of chattels if the property was transferred to a person who is entitled to immediate possession of them. In such a case, "no tort has occurred, since the possession has merely been surrendered to one who has a right to it." [Quoting 1 Restatement Torts, 2d, § 235, comment d, p 461.] In the *Hext* case, however, the buyers were not entitled to immediate possession as against the secured party until after their purchases that the selling agent helped to arrange. The buyers had no preexisting superior right to the property that apparently is necessary if liability is to be avoided for the reason advanced by the court in *Hext*. Arguably, therefore, the agent's immunity in *Hext* is a product of bootstrap reasoning. [Hillman, McDonnell, Nickles, Common Law and Equity Under the Uniform Commercial Code, ¶ 22.01(2)(a)[iv], p 22-12.]

The *Hext* analysis was also criticized in *First National Bank of Amarillo v Southwestern Live-*

---

[19] The *Kearney* approach is also, as noted above and on pp 281–282, the common-law rule in the great majority of jurisdictions, and defendant has not asked us to revise it. Even if we were inclined to do so, this case would not be an appropriate setting. The 1986 revision of § 9-307 assures that the situation in this case cannot again arise. Were we to revise the rule today, it would have virtually no effect on livestock/farm product cases (except those which arose prior to 1986) while it could have significant effect on other types of sales agent cases. Any such change should be taken only in a case where a party actively sought it and where its effects would be more immediately discernible.

*stock, Inc,* 616 F Supp 1515, 1519-1520 (D Kan, 1985), whose reasoning we adopt:

This Court is not persuaded by *Hext*'s reliance on Restatement (Second) of Torts, § 233(1). Even assuming the Fifth Circuit was correct in equating the buyer's entitlement to possession with the strength of title acquired after sale, the premise of § 233(1) is that the buyer acquires all, but only, the degree of title previously possessed by the seller; therefore, the strength of the buyer's title is considered prima facie evidence of the validity of the sale. This premise is clear in the illustrations following § 233(1):

1. A, as agent for B, negotiates a purchase from C of goods stolen from D. A delivers the goods to B. A is subject to liability to D for conversion.

2. A, as agent for B, negotiates a sale to C of goods which B has stolen from D. A delivers the goods to C. A is subject to liability to D for conversion.

In contrast to these situations, under the unique provisions of the UCC a buyer may acquire bona fide title to property even when the sellers, as in this case, had none to convey. That simply does not mean, as defendant would have the Court believe, that the agent's sale of the chattel was proper. The premise of § 233(1), that the ultimate buyer acquires only such title as the seller has to convey, is not always true under the UCC. Therefore, in these cases the buyer's title may not be looked to as prima facie evidence of whether the agent's sale was proper as against the seller's creditor. Section 233(1) does not govern the question of the agent's liability for conversion.

The critical factor, rather, is the debtor's authorization to sell. Unless otherwise provided by the UCC, a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors. [UCC § 9-201.] The failure to perfect one's security interest does not impair the secured party's right to pro-

ceed against the debtors. Clark, The Law of Se-
cured Transactions, ¶¶ 3.2[2], 9.4[1]. In this case
defendant nowhere claims the [debtor] or [the
auctioneer] derivatively, were authorized to sell
the cattle. Under the law allowing an unperfected
secured creditor to proceed against its debtor for
conversion, so may the plaintiff in this case pro-
ceed against the debtors' agent, which merely
"stands in the shoes of his principal" regardless of
the rights acquired by the ultimate buyer for
value.[20]

Accordingly, we hold that the Restatement of
Torts, 2d, § 233(1), even when read in the light of
UCC 9-307, does not shield the defendant from
liability.

B

In 1986, the Legislature substantially revised
§ 9-307 so as to provide for actual notice to auc-
tioneers of any outstanding security interests in
the farm products which come before them for
auction. (See Appendix.) The details of this new
scheme need not concern us, but its purpose is to
avoid the very situation in which the litigants in
this case find themselves and to shield auctioneers
from such liability where they have complied with
the statute's requirements and have not received
actual notice.

Defendant cites two cases, *United States v Pro-
gressive Farmers Marketing Agency, supra,* and
*Utah Farm Production Credit Ass'n v Hansen,* 738
P2d 642 (Utah App, 1987), in which the protec-
tions afforded to livestock auctioneers under simi-

---

[20] This conclusion was affirmed by the Tenth Circuit, which noted
that the Restatement provision shields an agent from liability only if
"its transferee had a *preexisting* and superior right to possession."
*First National Bank of Amarillo v Southwestern Livestock, Inc,* 859
F2d 847 (CA 10, 1988) (emphasis in original).

lar revisions of § 9-307 were applied retroactively as a matter of public policy.[21]

We agree that the system now in place is a superior mechanism for ensuring fairness and efficiency in the farm product market. However, that alone does not compel a different result in this case.

When the Legislature revised § 9-307, the Senate Analysis Section issued two Bill Analyses, the first, analyzing the original bill which would simply have done away completely with the farm products exception without substituting any notification system for it, and the second, analyzing the enrolled bill which is the law today. Each of these analyses described the intent of the original § 9-307 as follows:

> The intent of the exemption for farm products was to protect the collateral security of lenders who made loans to farmers, thus helping to ensure the availability of credit to farmers. [Senate Legislative Analyses, SB 362, June 6, 1985 and March 10, 1986.]

If the intent of the original provision was to protect creditors so as to ensure the availability of credit, then the controlling public policy, in the view of the Legislature, was not to "be fair" to

[21] In the *Progressive Farmers* decision, the Court of Appeals for the Eighth Circuit focused on whether the collateral was inventory or farm products for purposes of § 9-307 and it concluded that the collateral was inventory. However, even assuming that conclusion is correct, § 9-307 as in effect in this case and in *Progressive Farmers* does not in and of itself protect anyone other than a buyer in the ordinary course of business. Absent some further provision such as the Restatement section just discussed, there is no mechanism by which § 9-307 can be applied to shield an auctioneer. Therefore, the *Progressive Farmers* application of the then-existing § 9-307 has no basis. For this reason, we read *Progressive Farmers* as resting on a retroactive application of the policies embodied in the revised version of § 9-307 and Congress' passage of the Food Security Act, PL 99-198, § 1324(g), which provided for similar reforms.

buyers and commission merchants, but instead to make sure that creditors received payment for their agricultural loans. That being the intent, it is appropriate to assign liability as broadly as possible.

In addition, under the new provision, the debtor has a duty to inform the creditors of its likely sales agent. Since the debtor did not have that duty in this case, it would be improper to apply duties to the creditors beyond those defined in the provision controlling at the time this case arose.

In light of these concerns, and the general principle that statutes shall not be applied retroactively, e.g., *McQueen v Great Markwestern Packing Co,* 402 Mich 321; 262 NW2d 820 (1978), we decline to apply the policies of the new statute in this case.

V

In sum, we hold that neither UCC 7-404 nor UCC 9-307 shields the defendant from liability in this case. We therefore reverse the judgment of the Court of Appeals and vacate the order of summary judgment in defendant's favor.

Defendant argues that certain other defenses, such as a possible waiver of the bank's security interest,[22] were not considered by the trial court in its grant of summary judgment for the plaintiff. Whether such defenses were in fact considered by the trial court is not clear from the record, and we therefore remand the case to that court for proceedings consistent with this opinion.

Levin, Cavanagh, Boyle, and Archer, JJ., concurred with Brickley, J.

---

[22] See MCL 440.9306; MSA 19.9306.

APPENDIX

MCL 440.9307; MSA 19.9307, after amendment by 1985 PA 199, provides:

(1) Except as otherwise provided by subsection (10), a buyer in ordinary course of business, as defined in section 1201(9), takes free of a security interest created by his or her seller even though the security interest is perfected and even though the buyer knows of its existence.

(2) Subsections (3) to (10) shall apply in the case of a person buying farm products from a person engaged in farming operations.

(3) If requested by the secured party, a debtor engaged in farming operations who gives a security interest in farm products shall provide to the secured party a written list identifying potential buyers and points of delivery of the farm products. Except as otherwise provided by subsection (4), the number of potential buyers for each commodity shall not exceed 5. If a potential buyer has more than 1 point of delivery, each additional point of delivery shall be counted as a potential buyer.

(4) A debtor engaged in farming operations who provides a written list of potential buyers to a secured party pursuant to subsection (3) shall not sell farm products that secure the debt to a buyer who is not identified on the list without the prior written consent of the secured party. A person who knowingly or intentionally violates this subsection is guilty of a felony, punishable by imprisonment for not more than 3 years or a fine of not more than $10,000.00, or both. If appropriate given the facts and circumstances of the case, the court shall place the person on probation upon the condition that restitution be made to the secured party. Payment of, or application of the proceeds to, the debt upon which the security interest is based shall be an absolute defense to a prosecution under this subsection if the payment or application is made prior to commencement of prosecution.

(5) A secured party who is provided with a written list of potential buyers pursuant to subsection (3) may notify buyers identified on the list of the security interest as provided in this subsection. A secured party shall not notify a person not identified on the list, except that the secured party may notify a buyer concerning whom the secured party has given prior written consent pursuant to subsection (4) or to whom the secured party has reasonable cause to believe the debtor is about to sell the farm products. A notice provided pursuant to this subsection shall be in writing, and shall be mailed by certified mail or delivered by another method by which receipt can be verified. The notice may be in a form agreed upon in writing by the buyer and the secured party, but in absence of such an agreement the notice shall be an original financing statement or a carbon, photographic, or other reproduction of an original that is effective under section 9402, or a statement that contains all of the following:

(a) The full name and address of the debtor.

(b) The full name and address of the secured party.

(c) A description of the collateral.

(d) The date and location of the filing of the security interest.

(e) The date and signature of the secured party.

(6) If the debt that is the basis of the security interest is satisfied, the secured party shall notify in writing each potential buyer to whom the secured party sent notice under subsection (5). The notice may be given within a time period agreed upon in writing by the buyer and the secured party, but in absence of such an agreement the notice shall be given within 11 days after the debt is satisfied.

(7) A secured party who does any of the following is guilty of a misdemeanor, punishable by imprisonment for not more than 90 days or a fine of not more than $1,000.00, or both:

(a) Knowingly or intentionally gives false or

misleading information in a notice provided pursuant to subsection (5).

(b) Sends notice to a potential buyer other than as permitted in subsection (5).

(c) Fails to notify a potential buyer of the satisfaction of a debt within the time period prescribed by subsection (6).

(8) A buyer of farm products who receives notice pursuant to subsection (5) of a security interest in the farm products shall make payment for the farm products by check or other instrument made payable to the seller and the secured party jointly, except that payment may be made directly to the secured party if authorized in writing by the seller. This subsection shall not apply to any payment or partial payment made before notice under subsection (5) has been received by the buyer. A buyer of farm products who violates this subsection is guilty of a misdemeanor, punishable by imprisonment for not more than 90 days or a fine of not more than $1,000.00, or both. Payment of, or application of the proceeds to, the debt upon which the security interest is based shall be an absolute defense to a prosecution under this subsection if the payment or application is made prior to commencement of prosecution.

(9) As used in subsections (2) to (8), "person buying farm products" or "buyer" includes a commission merchant or selling agent who sells farm products in the ordinary course of business for a person engaged in farming operations.

(10) A buyer in ordinary course of business who receives notice pursuant to subsection (5), who buys farm products from a person engaged in farming operations, and who withholds all or part of the proceeds of the sale from the seller in order to satisfy a debt owed by the seller to the buyer, takes subject to a security interest in those farm products created by the seller, unless the debt owed by the seller to the buyer was secured by a prior perfected security interest. For purposes of this subsection, "debt" does not include the cost of harvesting; processing, including packaging, freez-

ing, canning, and drying; storing; or marketing the farm products, or transporting the farm products to market.

(11) Except as otherwise provided by subsection (12), a commission merchant or selling agent who sells farm products, in the ordinary course of business, for a person engaged in farming operations shall not be liable to the holder of a security interest in those farm products even though the security interest is perfected and even though the commission merchant or selling agent knows of its existence.

(12) A commission merchant or selling agent who sells farm products, in the ordinary course of business, for a person engaged in farming operations, and who receives notice pursuant to subsection (5), shall not be protected from liability under subsection (11) if the commission merchant or selling agent withholds from the seller all or part of the proceeds of a sale of the farm products in order to satisfy a debt owed by the seller to the commission merchant or selling agent, unless the debt was secured by a prior perfected security interest. For purposes of this subsection, "debt" does not include the cost of harvesting; processing, including packaging, freezing, canning, and drying; storing; or marketing the farm products, or transporting the farm products to market.

(13) A prosecution under subsections (8) to (10) shall not be commenced after the expiration of 2 years following the date the violation occurred.

(14) In the case of consumer goods, a buyer takes free of a security interest even though perfected if the buyer buys without knowledge of the security interest, for value and for the buyer's own personal, family, or household purposes unless prior to the purchase the secured party has filed a financing statement covering such goods.

(15) A buyer other than a buyer in ordinary course of business under subsection (1) takes free of a security interest to the extent that it secures future advances made after the secured party acquires knowledge of the purchase, or more than

45 days after the purchase, whichever first occurs, unless made pursuant to a commitment entered into without knowledge of the purchase and before the expiration of the 45-day period.

RILEY, C.J. (*concurring*). While I agree with the majority that Articles 7 and 9[1] of the Uniform Commercial Code do not protect plaintiff in the instant case, I write separately because I disagree with its decision to avoid classifying the collateral (the livestock) as either farm products or inventory for purposes of Article 9.[2]

It is axiomatic that in order to determine the priority of a debtor's creditors under Article 9, we must first classify the collateral. As the majority notes, classifying the livestock as either farm products or inventory determines whether the "farm products" exception within § 9-307(1) exempts the Michigan Livestock Exchange from the general language of § 9-307(1) which provides that "a buyer in the ordinary course of business . . . takes free of a security interest created by his . . . seller . . . ." In the instant case, unless the "farm products" exception exempts the exchange from § 9-307(1), then Article 9 arguably shelters the exchange from conversion liability.

However, in my opinion, livestock owned by a debtor, but temporarily in the hands of an auctioneer, does not destroy an otherwise valid perfected security interest. See *First Nat'l Bank in Lenox v*

---

[1] Before amendment by 1985 PA 199.

[2] I recognize that this Court need not resolve this issue in order to subject defendant to conversion liability. However, because I conclude that livestock in the hands of the defendant constitutes farm products, rather than inventory, I find it unnecessary to discuss the interrelationship between *United States v Hext,* 444 F2d 804 (CA 5, 1971), and Article 9 because I conclude that the livestock in the instant case fit within the farm products exception of § 9-307(1). Accordingly, I will only briefly address the issue.

*Lamoni Livestock Sales Co,* 417 NW2d 443 (Iowa, 1987); *In re Roberts,* 38 BR 128 (D Kan, 1984); but see *United States v Progressive Farmers Marketing Agency,* 788 F2d 1327 (CA 8, 1986). Presumably, in order to conclude that the livestock constituted inventory, the majority would have to rely upon Official Comment 4 to § 9-109.[3] Two federal courts interpreting state law reached this result.

For example, in *Progressive Farmers, supra,* the Court of Appeals for the Eighth Circuit concluded under Iowa law that Official Comment 4 expressed the intention of the drafters to reclassify collateral in the hands of an auctioneer as inventory, rather than farm products. I disagree.

In the year following the *Progressive Farmers* decision, the Iowa Supreme Court expressly rejected the rationale and conclusion reached by the *Progressive Farmers* court. *First Nat'l Bank in Lenox, supra.* See also *In re Roberts, supra.* I prefer to adopt the reasoning of the Iowa Supreme Court's interpretation of § 9-307(1) rather than the attempt by the Court of Appeals for the Eighth Circuit to speculate how the Iowa Supreme Court would decide the issue.

Similarly, the revised version of § 9-307 in Michigan, 1985 PA 199, supports the conclusion that the legislators intended to classify livestock in the hands of auctioneers as farm products and not inventory under the older version of § 9-307. In addressing the proposed amendment to § 9-307, the Journal of the House referred to HB 362 (1985 PA 199) as the "clear title exception under certain circumstances for all *farm products;* provided for." 1985 Journal of the House 4524 (emphasis added). Similarly, §§ 9-307(9), (11) and (12) continuously describe collateral in the possession of a commis-

---

[3] "Goods are 'farm products' only if they are in the possession of a debtor engaged in farming operations."

sion merchant as *farm products* and not inventory. For example, as § 9-307(9) states, " 'buyer' includes a commission merchant or selling agent who sells *farm products* in the ordinary course of business for a person engaged in farming operations." (Emphasis added.) See also §§ 9-307(11) and (12). Whereas, the majority's interpretation would render the term "farm products" within these provisions incongruous with the provisions themselves because it classifies the livestock as *inventory* while § 9-307 refers to the livestock as *farm products.* If the Legislature intended to classify collateral in the temporary possession of an auctioneer as inventory, it could have done so rather than specifically referring to the collateral as farm products.

Accordingly, I would classify livestock in the instant case as farm products and not inventory for purposes of Article 9. Therefore, I agree with the majority that Articles 7 and 9 do not protect the exchange from liability for conversion of the debtor's livestock.

GRIFFIN, J., concurred with RILEY, C.J.