552 P.2d 317 (1976)
MIDLAND BEAN COMPANY, a Colorado Corporation, Plaintiff-Appellant,
v.
The FARMERS STATE BANK OF BRUSH, a Bank chartered by the State of Colorado, Defendant-Appellee.
No. 75-194.
Colorado Court of Appeals, Div. II.
March 25, 1976.
As Modified on Denial of Rehearings May 6, 1976.
*319 Geddes, Sparks, MacDougall & McHugh, P. C., M. E. MacDougall, Colorado Springs, for plaintiff-appellant.
C. H. Anderson, Edgar H. Brandenburg, Robert B. Chapin, Brush, for defendant-appellee.
Selected for Official Publication.
STERNBERG, Judge.
Brush Elevator Company borrowed money from defendant, Farmers State Bank of Brush, which took and duly perfected a security interest in the assets of Brush Elevator. When Brush Elevator defaulted, the bank, as secured creditor, took possession of Brush Elevator's assets for the purpose of liquidating the business. Plaintiff, Midland Bean Company, alleged ownership of beans which it had bought but not received from Brush Elevator. Midland made demand on the bank for the beans. When the bank refused to deliver, this damage suit followed. After trial to court, all of plaintiff's claims for relief were dismissed and judgment was granted the bank on one of its counterclaims. We affirm in part and reverse in part.
Midland claimed that between September 4, 1971, and May 4, 1972, it purchased over 9,000,000 pounds of U.S. No. 1 Pinto beans from Brush Elevator. Midland issued drafts to Brush Elevator, evidencing these purchases which were endorsed by Brush Elevator and duly cashed. Of these purchases, Midland, by its own count, ultimately received by shipment or credit all but 962,170 pounds of these beans. On May 10, 1972, the bank participated in a Small Business Administration guaranteed loan of $140,000 to Brush Elevator, taking a security interest in all assets of Brush *320 Elevator, including inventory, accounts receivable, and contractual rights. The bank's financing statements were filed in the proper counties on May 11 and 12, 1972. On September 13, 1972, the president and major shareholder of Brush Elevator abandoned his duties, left the area, and did not return, thereby precipitating a default on Brush Elevator's obligations on the loan. Neither Midland nor the bank had actual knowledge that the other claimed any ownership or security interest in beans until after Brush Elevator defaulted.
On September 19, 1972, the date the bank took possession of the assets of Brush Elevator, an inventory of the beans in the elevator was taken. This inventory and records of the later liquidation accounts of the bank indicated that the only 1971 U.S. No. 1 Pinto beans stored in the elevator on that date were those owned by the growers thereof. The ownership of these growers' beans was evidenced by "scale tickets" issued to and held by such growers and confirmed by "settlement sheets" in the records of Brush Elevator. All other beans stored on that date were either broken beans, seed beans, or growers' beans from the harvest of 1972. Between September 19, 1972, and January 31, 1973, the bank operated the elevator and honored in full the claims of all the growers.

I. DRAFTS AS DOCUMENTS OF TITLE
Midland's claim of ownership rights in the beans is based solely on 44 drafts it issued and addressed to Brush Elevator which it contends are nonnegotiable "documents of title" under § 4-1-201(15), C.R.S. 1973, of the Uniform Commercial Code. The trial court found in the alternative that these drafts were: (a) not documents of title under the UCC, but (b) even if they were documents of title, plaintiff gained no rights thereunder as against the bank or the growers.
By § 4-1-201(15), C.R.S. 1973, a document of title is defined to include:
"[B]ill of lading, dock warrant, dock receipt, warehouse receipt, or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold, and dispose of the document and the goods it covers. To be a document of title, a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass." (emphasis supplied)
Since the drafts in question here were addressed to Brush Elevator, a bailee, and since they purported to cover goods in the bailee's possession, which are fungible portions of an identified mass, they come within the definition of documents of title if they were treated in the regular course of business as evidencing ownership of the goods they purport to cover.
Several sections of the UCC guide us in determining whether the drafts meet this last requirement for being documents of title. In particular, the following illuminate the issue:
"This title shall be liberally construed and applied to promote its underlying purposes and policies [which purposes and policies include] [t]o permit the continued expansion of commercial practices through custom, usage, and agreement of the parties. . . ." Section 4-1-102, C.R.S. 1973.
"Unless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant. . . or other validating or invalidating cause shall supplement its provisions." Section 4-1-103, C.R.S. 1973.
"(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common *321 basis of understanding for interpreting their expressions and other conduct. (2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. . . . (3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.. . ." Section 4-1-205, C.R.S. 1973.
And finally, the comment to the definition of documents of title states:
"The definition is stated in terms of the function of the documents with the intention that any document which gains commercial recognition as accomplishing the desired result shall be included within its scope."
At the trial, Midland introduced extensive and uncontroverted evidence that it always purchased beans by use of drafts which had the kind of beans and number of pounds purchased written on them. Both the secretary-treasurer and the president of Midland stated that they considered that such drafts evidenced their ownership of the beans so purchased even when the beans remained in storage. Also, they testified that no other document, such as a warehouse receipt, ever passed between them and Brush Elevator. Moreover, two other witnesses, not parties to this action, who were in the business of purchasing beans, testified that in their businesses, they used similar drafts as the sole documents evidencing purchase and ownership, and that such was the custom in the bean business. Finally, the record indicated that defendant bank itself, after it took over the operation of Brush Elevator, bought beans solely by means of similar drafts.
Viewing this evidence in the light of the above noted provisions of the Uniform Commercial Code, we conclude that plaintiff's drafts are "documents of title" under § 4-1-201(15), C.R.S. 1973, since they were treated as such both by the parties themselves and were customarily so used in the bean business in general.

II. MIDLAND'S RIGHTS IN THE BEANS
The trial court found in the alternative that even if these drafts were documents of title under § 4-1-201(15), C.R.S. 1973, Midland gained no rights under these drafts against the bank or the growers. Midland urges three theories under which it allegedly has rights, under its documents of title, to beans owned by or found in Brush Elevator at the time of default.

A. The "Lundlock" Beans

Midland's first theory concerns the so-called "Lundock" beans. These were 1971 beans held by Brush Elevator not subject to claims by growers. At the time the bank took control of the assets of Brush Elevator, it found in the safe of that company, the original of an unendorsed warehouse receipt for beans issued by Robinson Grain Company of Colorado Springs, dated December 7, 1971. This receipt was issued to William Lundock, and reflected that 90,700 pounds of U.S. No. 1 Pinto beans had been received by the Robinson Grain Company. On January 4, 1972, Brush Elevator purchased these beans from Mr. Lundock. Pursuant to a stipulation and order, these beans were sold on July 18, 1973, and the net proceeds of $10,742.78 paid into the court.
Midland maintained at trial that its drafts, which described the beans by kind and quantity, vested title to the beans in it. We agree.
While the drafts are negotiable instruments, by § 4-7-104(1)(a), C.R.S. 1973, they are nonnegotiable documents of title since their terms do not require delivery of the beans to "bearer or to the order of a *322 named person." Midland's rights therefore are governed by § 4-7-504(1), C.R.S. 1973, which provides:
"A transferee of a document, whether negotiable or nonnegotiable, to whom the document has been delivered but not duly negotiated, acquires the title and rights which his transferor had or had actual authority to convey."
Since it was uncontested that Brush Elevator purchased these beans from Mr. Lundock, and thus had title to them, it follows that Brush Elevator could convey full rights in the "Lundock" beans to Midland. And, in fact, Brush Elevator had endorsed the drafts and accomplished the transfers. Thus, since the drafts of Midland were documents of title, and represented the purchase by Midland of 1971 U.S. No. 1 Pinto beans from Brush Elevator under which description the "Lundock" beans fall, these drafts operated to make Midland the owner of the "Lundock" beans.
The trial court concluded that the security interest of defendant bank in the inventory of Brush Elevator gave the bank title to the "Lundock" beans. We disagree. Even though the bank possessed a warehouse receipt for the "Lundock" beans, which possession could perfect a security interest in the beans under § 4-9-304(2), C.R.S. 1973, here, the necessary attachment of the security interest is absent. For perfection to obtain at all, a security interest must first attach, § 4-9-303, C.R.S. 1973. Furthermore, a security interest cannot attach until (1) there is agreement that it attach; (2) value is given; and (3) the debtor has rights in the collateral, § 4-9-204(1), C.R.S. 1973. In this case, attachment was never effected since Brush Elevator at the time it gave a security interest in its inventory to Farmers State Bank on May 10, 1972, had no rights of its own in the "Lundock" beans. This was so because title to them had passed to Midland as holder of a negotiated instrument some time after the time of purchase of the beans, January 4, 1972, and some time prior to issuance of Midland's last draft, May 4, 1972. In any event, title had passed to Midland prior to May 10, 1972, on which date the bank had obtained the security interest. Through inadvertence, the warehouse receipt which should have been cancelled was not. However, since title and all rights to the goods themselves had passed previously to Midland, and Brush Elevator had no "rights in the collateral" as required by § 4-9-204(1), 'C.R.S. 1973, Brush Elevator could not grant a security interest in the "Lundock" beans. The bank's possession of the warehouse receipt could not evidence perfection of a security interest which had never attached.

B. The Pro Rata Share Theory

Secondly, Midland asserts that under its documents of title, it had a right to a pro rata share in the beans stored by Brush Elevator at the time of default. We disagree.
At the time the bank took control of the assets of Brush Elevator an inventory was taken. This inventory and records of sales made by the bank during the liquidation of the business were introduced into evidence. Based on figures computed from these two exhibits by the bank's expert witness, there was in fact a deficiency of such beans on hand at the time of default when measured against claims by growers of 1971 beans. Although the computations of this expert were contested by Midland at trial, the trial court found that there were no U.S. No. 1 Pinto beans in Brush Elevator on September 9, 1972, in excess of growers' beans. This finding of fact was based on substantial evidence and may not be disturbed on review. See Broncucia v. McGee, 173 Colo. 22, 475 P.2d 336.
Midland also contends in this regard that since both it and the growers held nonnegotiable documents of title, § 4-7-207, C.R.S. 1973, requires a pro rata distribution of goods in the elevator. This section provides:
"(1) Unless the warehouse receipt otherwise provides, a warehouseman must keep separate the goods covered by *323 each receipt so as to permit at all times identification and delivery of those goods except that different lots of fungible goods may be commingled. (2) Fungible goods so commingled are owned in common by the persons entitled thereto, and the warehouseman is severally liable to each owner for that owner's share. Where because of overissue a mass of fungible goods is insufficient to meet all the receipts which the warehouseman has issued against it, the persons entitled include all holders to whom overissued receipts have been duly negotiated." (emphasis supplied)
Midland's reliance on this section is misplaced for several reasons. First, in contrast to the growers' claims, its claim is based on drafts it issued, and not warehouse receipts issued to it by the warehouseman. See In Re Fairfield Elevator Co., Inc. (S.D.Iowa). Moreover, the drafts on their face are marked "Non Negotiable." For Midland to be treated as a co-owner of the beans with the growers under this statute, their documents would had to have been negotiated. See Citizens Bank & Trust Co. v. SLT Warehouse Co., 368 F.Supp. 1042 (M.D.Ga.), affirmed, 515 F.2d 1382 (5th Cir.); and Proctor & Gamble Co. v. Lawrence American Field Warehousing Corp., 22 A.D.2d 420, 255 N. Y.S.2d 788.
Nevertheless, Midland urges that it should be protected as a buyer of fungible goods in the ordinary course of business under § 4-7-205, C.R.S. 1973. This section provides:
"A buyer in the ordinary course of business of fungible goods sold and delivered by a warehouseman who is also in the business of buying and selling such goods takes free of any claim under a warehouse receipt even though it has been duly negotiated." (emphasis supplied)
This section requires that the goods in question be delivered which was not the case here, and thus does not mandate the result urged by Midland. The comment to this section makes it clear that "delivered" under this section means delivered in fact, not symbolic delivery by means of a transfer of documents.
Furthermore, the bank delivered the beans on hand to the growers, their true owners. Citizens Bank & Trust Co. v. SLT Warehouse Co., supra, a case arising under the UCC, reiterates the precode proposition that if the warehouseman delivers the goods to the true owner, he is relieved from liability even to a good faith purchaser of negotiable goods receipts and, a fortiori, from liability to any other sort of receipt holder. See First National Bank v. Petzoldt, 262 F.2d 540 (10th Cir.).

C. The 1972 Beans

Finally, Midland contends that the trial court erred both in distinguishing between 1971 and 1972 beans and in its subsequent conclusion that Midland was not entitled to any 1972 beans stored by Brush Elevator at the time of default. Contending that it bought and paid for U.S. No. 1 Pinto beans and that the particular year in which the beans were harvested was irrelevant under its documents of title, Midland maintains that it should have shared in the 1972 beans on hand in Brush Elevator at the time of default. We disagree.
The evidence at trial revealed that Midland's last draft in payment for U.S. No. 1 Pinto beans was issued in May 1972, prior to the June planting of the 1972 crop. Therefore, there were no 1972 beans in existence at that time. There was testimony from Midland's president that the drafts were issued for 1971 beans. Thus, the drafts, which under our analysis represent title to the beans purchased thereby, covered only 1971 beans. Furthermore, the inventory of beans on hand at the time of default showed that there were no 1972 beans in storage except growers' beans, which we have held above were owned by the growers.

*324 III. THE BANK'S LIABILITY FOR ACTS FOLLOWING FORECLOSURE
Midland asserts that when the bank took over the assets of Brush Elevator under its security interest, it became answerable for the debts of that company as a partner, principal, or joint venturer. Therefore, Midland contends that the bank is liable for its entire loss. However, the trial court found that the bank was at no time involved in a joint venture, partnership, or agency relationship with Brush Elevator, but at all times pursued its rights as a secured creditor in a lawful manner. We find no error in that conclusion.
Midland urges in this regard that since after default, the bank borrowed money for Brush Elevator operations, began to issue warehouse receipts to producers who requested them, purchased growers' beans for resale, processed beans, some of which were "bin burned," and sold beans to consumers, the bank: (a) engaged in self-dealing and received benefits from the operation of the enterprise, and is thus answerable for the debts of that enterprise; (b) acted as agent for Brush Elevator in purchasing beans and thus the purchased beans should be considered as supplying the deficiency in beans existing at the time of default; and (c) did not act in a commercially reasonable manner in liquidating the assets.
With regard to Midland's contention concerning self-dealing, the trial court found that the bank received no benefits from the foreclosure and liquidation of the assets of Brush Elevator; to the contrary, the court concluded upon substantial evidence in the record that the bank suffered a loss. Such a finding of fact will not be disturbed on review. See Broncucia v. McGee, supra.
In reference to Midland's suggestion that the bank was Brush Elevator's agent, we note that there was no evidence presented at trial of any agreement between the bank and Brush Elevator which would warrant holding it liable for the debts of the elevator as an agent, partner, or joint venturer.
Finally, while we find no evidence in the record indicating that the bank acted in other than a commercially reasonable manner when it took over the assets of the elevator on default, we do not reach that issue since Midland has presented no proof of damage by any actions of the bank in liquidating the assets.
Midland also alleges in this regard that the bank in its foreclosure and liquidation procedures did not comply with the requirements regarding bulk transfers as set forth in §§ 4-6-101 through 4-6-111, C.R.S. 1973, and that thus the disposition of the property by the bank was improper. However, "transfers in settlement or realization of a lien or other security interest" are expressly exempted from requirements applicable to bulk transfers. Section 4-6-103, C.R.S. 1973.
We have considered Midland's other allegations of error and find them to be without merit.
The judgment of the trial court is affirmed in all respects except as to the proceeds from the sale of the "Lundock" beans and in that regard, the judgment is reversed and the cause remanded for entry of a judgment in favor of Midland with interest in accordance with the stipulation of the parties.
ENOCH and RULAND, JJ., concur.