The BANK OF NEW YORK, Plaintiff,

v.

AMOCO OIL COMPANY, Defendant.

No. 90 Civ. 1617 (CHT).

United States District Court,
S.D. New York.

Aug. 26, 1993.

Saiber Schlesinger Satz & Goldstein, Newark, NJ (James H. Forte, Michael J. Geraghty, of counsel), for. plaintiff.

Goldstein & Claxton, Washington, DC (Melvin Goldstein, Charles R. Claxton, of counsel), for defendant.

### OPINION

TENNEY, District Judge:

The plaintiff Bank of New York ("BNY") brought this action in March of 1990 seeking damages incurred because the defendant, Amoco Oil Company ("Amoco"), allegedly wrongfully refused to turn over certain platinum to BNY. By the time BNY obtained the platinum, it was able to sell the metal only at a reduced price. BNY bases its rights to the platinum on holding certificates issued by Amoco, which were given to BNY as collateral for loans to Drexel Burnham Lambert Trading Corp. ("DBL Trading").

BNY is a New York corporation with its principal place of business in the state of New York. Amoco is a Maryland corporation with its principal place of business in

Illinois. This court has jurisdiction pursuant to 28 U.S.C. § 1332(a). John F. Keenan, U.S.D.J., denied the parties' cross-motions for summary judgment. He stated that the case turned upon interpreting Article 7 of the Uniform Commercial Code ("U.C.C."), and delineated the three significant issues for trial:

1. Were the holding certificates documents of title covered by U.C.C. Article 7?

2. If the holding certificates were documents of title, were they negotiable?

3. If the holding certificates were negotiable, did DBL [Trading] duly negotiate the documents to [BNY]?

Opinion and Order of Judge Keenan, November 5, 1991, at 6–7. The case was tried before this court in June of 1993.[1] For the reasons stated below, the plaintiff's request for relief in the form of money damages is granted.

### BACKGROUND

Amoco uses platinum to prepare catalysts that are used in reactors at Amoco's six refineries around the country. Transcript ("Tr.") 240–41. These catalysts accelerate the refining process in the manufacture of gasoline. Tr. 242. During the refining process, some platinum is lost—between 2000 and 4000 ounces each year. Although Amoco owns 280,000 ounces of platinum, it must occasionally lease platinum from other sources. Ernest A. Sloss, who was Amoco's Senior Supply Negotiator until 1992, testified that he leased from metal trading companies that delivered platinum to Amoco's catalyst manufacturers. Tr. 242. A particular shipment of platinum, once it is used to prepare catalysts for use in the refining process, can no longer be traced.

Mr. Sloss began obtaining platinum for Amoco in 1981, by purchasing, leasing, or drawing it from a pool account.[2] Tr. 275–76.

---

1. The court reserved decision on the admissibility of the defendant's exhibits at trial, which were moved into evidence as a group at the close of its case. Defendant offered in evidence the following exhibits: A through P, S through Z, AA through AI, and AW, AY, AZ, BB, and BE. The court receives into evidence all exhibits, except

for Def. Exh. I, J, K, and L. These four letters are inadmissible under Fed.R.Evid. 408 as offers to compromise.

2. A pool account is an account holding platinum. For example, Amoco had a pool account with Johnson Matthey in Pennsylvania, and would ar-

When leasing, Amoco would issue a holding certificate to the precious metal company from whom the platinum had been obtained. One of the first holding certificates was issued by Amoco to Westway Metals, a precious metals trading firm. The holding certificate, issued on Amoco's letterhead,[3] stated:

*Holding Certificate*

This is to certify that as of October 6, 1982, Amoco Oil Company holds for the account of Westway Metals Corporation 4,000 troy ounces of platinum sponge, catalytic grade, free of payment, and encumbered.

Amoco will continue to hold this material until such time this Holding Certificate is returned, and Amoco receives shipping instructions.

Pl. Exh. 23. This holding certificate was signed by Mr. Sloss; however, when plaintiff's attorney asked Mr. Sloss at trial what the language in the document meant, he stated that he did not know. He did not know what the terms "free of payment" or "encumbered" meant. Tr. 284.

The language of the holding certificates was changed in 1984 to state that the platinum was "free of all liens and encumbrances" and that Amoco was holding it for a particular metal company "or order." These changes were made at the request of Susan Gold, who worked first for Westway Metals and later for DBL Trading. Pl. Exh. 29; Tr. 267, 286–87. Again the documents were issued and signed by Mr. Sloss. When asked what he understood the language "free of all liens and encumbrances" to mean, Mr. Sloss responded, "Frankly . . . I really don't know what it means. It was of very little interest. It was something that Susan Gold requested in the holding certificates and that's why we put it in as an accommodation to her." Tr. 266. All Mr. Sloss knew was that the term "liens" referred to claims on property. Tr. 330.

Mr. Sloss never consulted with Amoco's inhouse counsel, Matthew Gallo, about the significance of the language in the holding certificates. Tr. 266, 268. As a rule, the holding certificate was the only evidence of a lease transaction issued by Amoco. Mr. Sloss recalled that at one point a company sent him a lease form that was a multi-page contract; he stated that he did not accept it, because he "wasn't interested in complicated procedures." Tr. 269.

When a holding certificate was returned to Amoco at the end of a lease, Mr. Sloss would put a slash through the document to indicate that the lease was over. Many of the holding certificates had endorsements over to banks on the back, some stamped as many as six or seven times. *See* Pl. Exhs. 25–27. Mr. Sloss stated, "I do recall seeing some [endorsement] stamps, but I paid no notion, primarily because the lease was over with." Tr. 269.

DBL Trading leased metals to companies such as Amoco in order to improve profitability on its precious metals inventory. Tr. 1227. Metal was also used as collateral by DBL Trading in lending transactions with various banks, including BNY, Chase Manhattan, Citibank, Republic National Bank, and others. *Id.*

DBL Trading entered into a lending relationship with BNY in which DBL Trading borrowed on an overnight basis. Frederick Van Den Hogen, who from 1987 to 1990 served as Vice President in the commodities department at BNY, was assigned twenty-five accounts to oversee—among them DBL Trading. He testified that during that period DBL Trading would collateralize its overnight loans with its precious metal inventory. Tr. 18.

The amount of the loan made available by BNY was limited to 95% of the daily value of the pledged collateral. As evidence of the collateral, BNY would receive a telex from the depository where the collateral was being held, a warehouse receipt, or a holding certificate. *Id.* The bank's rights in the collateral were reflected in a General Loan and Security Agreement between BNY and DBL Trad-

---

range a book transfer from the pool account when platinum was needed. The fact that the platinum is in such an account does not necessarily mean that it is all physically stored in a particular place.

**3.** The letterhead was actually that of Standard Oil Co. (Indiana), which changed its name to Amoco in 1985.

ing, which had been signed in 1982, Pl. Exh. 2, and a Promissory Note dated May 22, 1987, Pl. Exh. 1.

BNY accepted holding certificates from companies other than DBL Trading; they were also used as collateral for loans from BNY to Gerald Metals, a precious metal trader, and Cerro Sales, a copper trader. Tr. 20. BNY began accepting holding certificates from DBL Trading upon the request of Judy Murray, a DBL Trading employee, by letter of March 9, 1989, that attached samples of holding certificates. Pl. Exh. 3. Mr. Van Den Hogen testified that at that time, he reviewed the sample holding certificates to see that certain requirements were met:

> There are several things that are important on the holding certificates why we accepted them as our collateral. They had to be in negotiable form. That meant that the holding certificates issued by the holder of the metals would have to state that it was held to the order of the party and, that is, the holding certificates could be endorsed to other parties. It would have to state that the material was held free and clear of all liens and encumbrances. And that the material would be [re]leased on a surrender of the certificate properly endorsed.

Tr. 25–26.

Mr. Van Den Hogen showed the holding certificates to Barbara Hyland, the head of BNY's commodities group. She agreed with his decision that the certificates would constitute proper collateral. He wrote to Ms. Murray at DBL Trading to confirm that BNY would accept the holding certificates, stating that they "should be endorsed to the order of The Bank of New York by DBLTC [DBL Trading] prior to presentation." Pl. Exh. 6. He testified that he required this so that BNY could take possession of the platinum in the event of default. Tr. 29.

Mr. Van Den Hogen's letter also provided, "Financing against these Certificates will only be extended after our physical receipt of the respective Certificates and these Certificates will only be released after repayment has been received or upon simultaneous sub-

stitution of Certificates representing materials of sufficient market value to cover our financing." Pl. Exh. 6. He would not accept the holding certificates until BNY had filed U.C.C. financing statements identifying the prospective issuers of the holding certificates. *Id.*

Ms. Murray responded with a list of companies to whom DBL Trading leased metal. Although the list attached to her letter is headed by the statement, "Companies *Leasing* Metal from U.S." [4] (emphasis added), her letter states, "Per your request, following is a listing of the companies *holding* precious metal for [DBL Trading]." Pl. Exh. 7 (emphasis added).

BNY did in fact file U.C.C. financing statements in all locations provided by DBL Trading before accepting the holding certificates as collateral. Pl. Exh. 10. As stated by Mr. Van Den Hogen, "We insisted on perfecting our lien before accepting collateral in any location." Tr. 34.

Although BNY as a rule accepted holding certificates from DBL Trading, there were at least three that Mr. Van Den Hogen rejected. Pl. Exh. 11. He rejected one holding certificate issued by Irving Oil, Ltd., because it did not state that the metal in question was being held to the order of DBL Trading, it did not state that the metal was free of liens and encumbrances, and it did not state that the metals would be released upon presentation of the holding certificate. Tr. 35–36; Pl. Exh. 11. He rejected a holding certificate issued by Lair Petroleum, Inc. because "it states that the material is to be redelivered to [DBL Trading]'s account on January 27th which would restrict the delivery from being immediately available in the event of a presentation of this holding certificate." Tr. 36; Pl. Exh. 11. He rejected a third holding certificate issued by GAF Building Materials Corp., because it was not on letterhead stationery. Tr. 37; Pl. Exh. 11.

Three of the four holding certificates at issue in this litigation were accepted by BNY in December of 1989. Pl. Exh. 12. They conform to previous certificates that BNY

---

4. Evidently an error was made in typing the list; it was intended to say "Companies Leasing Metal from Us," i.e., leasing from DBL Trading. Tr. 1248.

had accepted, stating (on Amoco letterhead stationery):

### HOLDING CERTIFICATE

This is to certify that as of [date], we are holding for the account or order of:

Drexel Burnham Lambert Trading Corporation

60 Broad Street

New York, New York 10004

The following material:

5,000 troy ounces of platinum sponge metal 99.95% catalytic grade

This material is free of all liens and encumbrances.

Material is to be released on surrender of this Certificate properly endorsed.

Company Name: Amoco Oil Company

By: /s/_____

E.A. Sloss

Date: _____

Pl. Exh. 12. Of these certificates, one is dated August 16, 1989; one is dated April 19, 1989; and one is dated September 13, 1989. All three were signed by Mr. Sloss on November 30, 1989. On the reverse side of the holding certificates, in the bottom right hand corner, is the following statement:

[date]

Please deliver to the order of

Bank of New York

/s/_____

by the order of

Drexel Burnham Lambert Trading Corporation

*Id.* Each endorsement is dated December 6, 1989.

The fourth holding certificate is identical in wording to the other three, but is dated January 2, 1990; it was accepted by BNY as collateral on or about January 17, 1990. Pl. Exh. 13. It was signed by Mr. Sloss on January 5, 1990, and carries an endorsement identical to those on the backs of the other three, but is dated January 17, 1990. Pl. Exh. 13. Mr. Van Den Hogen testified that upon receipt of these holding certificates, he was not informed of any encumbrances to BNY's authority to take the platinum in the event of default. Tr. 38.

The lease agreement between Amoco and DBL Trading required that Amoco place the lease expiration dates on the holding certificates at issue in this litigation. Mr. Sloss did not do so, because he did not want to bother to issue new holding certificates if the leases were extended. Tr. 320.

On February 13, 1990, DBL Trading defaulted on an overnight loan that it had obtained from BNY. BNY immediately began liquidating collateral; this process was handled by Barbara Hyland, who was at that time a Vice President and manager of the commodities group at BNY. Tr. 486, 800–01. After an exchange of communications discussed in detail below, Amoco returned platinum to BNY. It did not do so, however, until April 4, 1990, after this action had been brought. Mr. Sloss instructed UOP, Inc., a platinum reclaimer that held platinum in a pool account for Amoco, to transfer 22,230 troy ounces of platinum from Amoco's account to BNY's account at Johnson Matthey's depository.

### DISCUSSION

BNY bases its conversion claim on the alleged superior rights that it had to the platinum under Article 7 of the U.C.C. If the holding certificates were negotiable documents of title that DBL Trading duly negotiated to BNY, then BNY obtained title to the platinum, and Amoco was under an obligation "to hold or deliver the goods according to the terms of the document free of any defense or claim by [it] except those arising under the terms of the document." N.Y. U.C.C. Law § 7–502(1)(d) (McKinney 1990); *see also Citizens Bank & Trust Co. v. SLT Warehouse Co.*, 368 F.Supp. 1042, 1045 (M.D.Ga.1974), *aff'd,* 515 F.2d 1382 (5th Cir.1975).

### I. The Holding Certificates as Documents of Title

The holding certificates come under the purview of Article 7 only if they fall within the definition of a document of title. The U.C.C. states that the following are documents of title:

Bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers. To be a document of title a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

U.C.C. § 1-201(15).

### A. Holding Certificates as "Other Documents" under Section 1-201(15)

■ The parties agree that the holding certificates are not bills of lading, warehouse receipts, or anything else specifically enumerated in section 1-201(15). However, BNY contends that they fall within the broad language describing "other documents" that constitute documents of title, and the court agrees.

Mr. Van Den Hogen's testimony demonstrated his belief that the holding certificates gave BNY the right, as required by the definition, to receive the platinum in the event of default. He testified that he interpreted the language of the holding certificates to mean "that in the event of a default by [DBL Trading], we would be able to endorse the certificates and present [them] to, in this case, Amoco and to obtain the goods immediately." Tr. 26.

When Mr. Van Den Hogen was asked whether he would have accepted the holding certificates as collateral if he could not call them in and receive the platinum at any time, and on demand, he stated that BNY would not have accepted them as collateral. Tr. 45–46. Moreover, the General Loan and Security Agreement between BNY and DBL Trading provided that BNY had the immediate right to liquidate collateral in the event of default. Pl. Exh. 2.

In addition to Mr. Van Den Hogen's testimony, the bank also presented testimony from two people outside of BNY who worked in the commodities industry. Michael D. Magidson, who is presently a Vice President and Chief Financial Officer at Gerald Metals, Inc., testified concerning Gerald Metals' use and issuance of holding certificates as collateral. Mr. Magidson was at times responsible for obtaining short term loans from a number of international banks. Tr. 117. Gerald Metals issued holding certificates like those at issue here, and Mr. Magidson testified that he believed they were accepted by all the banks with which Gerald Metals did business.[5] Tr. 120. He estimated that Gerald Metals has, in the last two decades, used between three and five hundred holding certificates as collateral for loans, some of which were issued by Amoco. Tr. 122.

As to the companies who issued holding certificates, Mr. Magidson stated that "the major industrial companies of nonferrous and precious metals in the United States" customarily issue holding certificates as collateral. Tr. 125. He testified that he understood a holding certificate to grant a bank the right to immediate possession in the event of default on a loan. Tr. 119.

BNY also presented the testimony of Terrence P. Sweeney, who is the Executive Director of Legal Affairs at Swiss Bank Corp. Mr. Sweeney testified that Swiss Bank is involved in commodities lending that includes loans secured by precious metals; one of the firms to which Swiss Bank made such loans was DBL Trading. Tr. 151. In short term financing,[6] Swiss Bank—along with other banks—accepted holding certificates as one form of collateral. Mr. Sweeney testified that prior to the inception of this lawsuit against Amoco by BNY, Swiss Bank accepted

---

**5.** The following banks were named over the course of Mr. Magidson's testimony: BNY, Chase Manhattan Bank, Chemical Bank, Citibank, French American Bank, Israel Discount Bank, Mellon Bank, Swiss Bank Corp., and Union Bank of Switzerland.

**6.** Swiss Bank often arranged such financing through intercreditor agreements, in which two or more banks would lend to a borrower on a secured basis. An intercreditor agreement serves to delineate the order of the banks' claims against that borrower, which clarifies priority of creditors in the event of default. Tr. 152.

as collateral documents similar to the holding certificates at issue here. Tr. 161.

Amoco presented the testimony of Daniel A. Mahni, who is currently employed at Republic National Bank of New York. Mr. Mahni testified that, as one involved in commodities lending, he would not have accepted holding certificates as collateral for overnight loans from DBL Trading. He stated that as a matter of practice in the industry, holding certificates are not considered a form of possessory collateral, and that they are not regarded as documents of title. Tr. 376. The court finds that Mr. Mahni's testimony was undercut significantly by his admission on cross-examination that he had not seen a holding certificate such as those at issue in this litigation until speaking with Amoco's attorneys last year. Tr. 401. He had no first hand knowledge of banking practices at other banks, such as Swiss Bank, Chemical Bank, or BNY. Tr. 401–02. Moreover, he stated that he would not be willing to accept as collateral a warehouse receipt or a bill of lading—which clearly constitute documents of title, see U.C.C. § 1–201(15)—unless it was issued by an authorized depository. Tr. 403–404.

Mr. Mahni had until 1988 worked for Chase Manhattan Bank in the commodities division, on the precious metals "team." Although he did not accept holding certificates as collateral on that team, he testified that, for example, the "nonferrous team," which presumably coordinated lending with holders of nonferrous metals, did accept holding certificates for use as collateral. Tr. 405. Mr. Mahni's testimony fell far short of its presumed goal of showing that industry practice in the late 1980s was not to accept holding certificates as collateral for overnight loans. This court did not find his testimony persuasive, either as to individual practices at particular banks or as to industry practice.

In sum, the court finds that BNY did treat the holding certificates as "adequately evidencing that [BNY] is entitled to receive, hold and dispose of the document and the goods it covers." U.C.C. § 1–201(15).

Moreover, industry practice was to accept holding certificates as well, at least in some circumstances, as documents of title. *See Midland Bean Co. v. Farmers State Bank,* 37 Colo.App. 452, 552 P.2d 317, 320–21 (1976) (holding that non-negotiable drafts describing goods and accompanied by checks constituted documents of title, where course of dealing and industry practice demonstrated that drafts were used as the only evidence of ownership of the goods). Notwithstanding Amoco's objections, discussed below, the holding certificates here did constitute documents of title and fall within the purview of Article 7.

### B. *Amoco's Status as a Bailee*

■ Amoco argues that the holding certificates are not documents of title because it was not a bailee under section 1–201(15). It claims that it was not holding the platinum for purposes of storage or transportation—the two traditional functions of bailees within the meaning of Article 7. Amoco also points to the definition of a bailee as "the person who by a ... document of title acknowledges possession of goods and contracts to deliver them." U.C.C. § 7–102(1)(a). Amoco claims that under the agreement between DBL Trading and Amoco, there was no contract for anything other than a *lease* of the platinum from DBL Trading to Amoco, and thus no contract to deliver the platinum.

There is some support for Amoco's position in *Michigan Nat'l Bank v. Michigan Livestock Exchange,* 432 Mich. 277, 439 N.W.2d 884 (1989). The plaintiff bank had received cattle as collateral for a loan to two farmers, the owners of the cattle.[7] However, at the farmers' request, the defendant livestock exchange auctioned off some of the cattle, unaware of the bank's security interest. The payment from the sale, minus a sales commission for the exchange, was all given to the farmers. The farmers failed to repay the bank, and the bank sued the exchange for conversion. The exchange claimed that as a

---

7. The collateral included "all livestock and increase" of the farmers to whom the loan was made. *Id.* at 885.

bailee, it was immune from the suit under U.C.C. section 7–404.[8]

The Michigan Supreme Court held that the auctioneer was not a bailee, because the contractual obligations of the auctioneer to feed, hold, and deliver the cattle after auction were incidental to the primary obligation of carrying out a sale. According to the court, this service did not fall under the purview of Article 7, which " 'deals with two ancient common callings, namely storage and transport.' " *Michigan Nat'l Bank*, 439 N.W.2d at 888 (quoting James J. White & Robert S. Summers, *Uniform Commercial Code*, § 21–2, at 135 (3d ed. 1988)).

The court also held that a "trucker's receipt" used in the auction transaction did not constitute a document of title. It was not a warehouse receipt because it did not state whether the goods were deliverable to bearer, a specific person, or to a specific person or order. *Id.* at 889. Moreover, the receipt did not fall under the broad language of section 1–201(15). Although the language was left open by the drafters of the U.C.C. in order to accommodate changes in technology and document dealings, the defendant had failed to show that the truckers' receipt was not in use at the time the U.C.C. was created. Yet such receipts were not included at that time in Article 7 as a document of title. *Id.* at 890. Thus the court inferred that the drafters could have included trucker's receipts as documents of title, but chose not to.

BNY challenges the appropriateness of applying *Michigan Nat'l Bank* here, for two reasons with which this court agrees. First, the holding certificates differ from the truckers' receipts at issue in *Michigan Nat'l Bank* because the holding certificates provide for the release of the platinum to a specific person—DBL Trading—or to order. Second, the Michigan court reasoned that the defendant failed to show that truckers' receipts were not in existence at the time the

code was drawn up, and yet they were not included in the code as a document of title. In this case, on the other hand, Amoco offered no evidence at trial to indicate that holding certificates *were* in use at the time the code was drawn up. Thus, the holding certificates were not deliberately excluded from the purview of Article 7, and the court sees no reason why they should be excluded in this case.[9]

Even if Amoco does not satisfy the technical definition of a bailee under section 7–102(1)(a), the requirements of section 1–201(15) may still be met. Under that section, Amoco need not be a bailee, but only must *purport* to be a bailee, in order to render the holding certificates documents of title. By changing the holding certificates to add language in which Amoco acknowledged that it was holding the goods, and would deliver them on surrender of the holding certificate "properly endorsed," Amoco changed its own function. It thus purported to be a bailee.

The fact that there was an underlying lease transaction rather than a contract for storage or transportation does not vitiate this conclusion. There was no language in the holding certificates themselves to indicate the nature of the underlying transaction. In the certificates, Amoco states that it is holding a specific quantity and grade of platinum, for the account or order of DBL Trading, and it agrees to release the platinum "on surrender of this certificate properly endorsed."

BNY also points out that "the *essential purpose* of Amoco's holding certificates was to put lenders on notice that DBL Trading had unencumbered inventory that it wished to pledge as collateral," Plaintiff's Pre–Trial Memorandum ("Pl. Pre–T. Mem.") at 40, and consequently their function was equivalent to documents of title. The court believes this to be the case; Amoco did change the wording

---

**8.** Section 7–404 provides that "[a] bailee who in good faith ... has received goods and delivered or otherwise disposed of them according to the terms of the document of title or pursuant to this article is not liable therefor," even if the person from whom the bailee has obtained the goods—in this case, the farmers—lacked the authority to dispose of the goods. *Id.*

**9.** BNY also claims that Amoco is a bailee under New York common law; while the argument is persuasive, it seems to be irrelevant, at least in this context. Because the term "bailee" is defined under and construed within the U.C.C., it is unnecessary to resort to New York common law here.

of the holding certificates by adding order language and specifically stating that the platinum was free of all liens and encumbrances.

While there is strong support for BNY's argument that Amoco was in fact a bailee, it is not necessary to so hold. Amoco purported to be a bailee, which suffices to bring it within the definition of a bailee as that term is used in section 1–201(15).

### C. The Platinum as Identified or Fungible

■ As a final attempt to remove the holding certificates from the purview of Article 7, Amoco argues that the platinum itself was not sufficiently described in the holding certificates. Section 1–201(15) states that a document of title must "purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass." *Id.*

It is true that a particular ounce of platinum, once used in the catalyst process, can not be traced and specifically identified. However, the use of the platinum in the refining process was not stated in the holding certificate. As to fungible goods such as the platinum, the comment to section 1–201(15) states that "[f]ungible goods are adequately identified within the language of the definition by identification of the mass of which they are a part." Official Code Comment § 1–201(15); *see Public Service Comm'n v. R.F. Gunkelman & Sons, Inc.,* 219 N.W.2d 853, 857 (N.D.1974) (holding that document in which sunflower seeds were identified by quantity and grade carried sufficient identification to constitute a document of title).

As a final point on the conclusion that the holding certificates constituted documents of title, the court notes the comment of the code's drafters:

> It is unforeseeable what documents may one day serve the essential purpose now filled by warehouse receipts and bills of lading.... The definition is stated in terms of the function of the documents with the intention that any document which gains commercial recognition as accomplishing the desired result shall be included within its scope.

Official Code Comment § 1–201(15). In light of the policy reflected in this language—that of allowing section 1–201(15) to cover a broad range of documents—and for the reasons stated above, the court holds that the holding certificates at issue here do constitute documents of title.

### II. Negotiability

In order to be negotiable, a document of title must state "by its terms [that] the goods are to be delivered to bearer or to the order of a named person." U.C.C. § 7–104(1)(a). The comment to the section states:

> A document of title is negotiable only if it satisfies this section. "Deliverable on proper indorsement and surrender of this receipt" will not render a document negotiable. Bailees often include such provisions as a means of insuring return of nonnegotiable receipts for record purposes. Such language may be regarded as insistence by the bailee upon a particular kind of receipt in connection with delivery of the goods. Subsection[ ] (1)(a) ... make[s] it clear that a document is not negotiable which provides for delivery to order or bearer only if written instructions to that effect are given by a named person.

Official Code Comment § 7–104(1)(a).

■ BNY asserts that the certificates were negotiable, although they did not quote the language of the section verbatim. It argues that an instrument is negotiable if, when looked at in its entirety, it evidences the intention of being negotiable. Amoco, on the other hand, advocates a strict interpretation of the wording of the document. It claims that the holding certificates should not be deemed negotiable because (1) they provide for the "holding" of the goods, rather than their "delivery," and do not quote the suggested language verbatim; (2) Amoco never intended that the documents be negotiable; and (3) the language of release on surrender does not create negotiability.

While there is little authority on point, cases decided before the U.C.C. was adopted have applied a broad definition of negotiability. *See, e.g., Gerard v. Bank of New York & Trust Co.,* 265 N.Y. 336, 340, 193 N.E. 165

(1934) (stating that an instrument is negotiable, even if order or bearer language is omitted, when "it is apparent from the whole nature of the instrument and the language employed that such was intended to be its character"), *reh'g denied,* 266 N.Y. 544, 195 N.E. 192 (1935); *Manny v. Wilson,* 137 A.D. 140, 143, 122 N.Y.S. 16, 19 (1st Dep't 1910) ("any words importing an intention that the instrument shall be negotiable suffice"), *aff'd,* 203 N.Y. 535, 96 N.E. 1121 (1911).[10]

BNY also relies upon *In re George B. Kerr, Inc.,* 25 B.R. 2 (Bankr.D.S.C.1981), *aff'd,* 696 F.2d 990 (4th Cir.1982), to support the contention that the section should be liberally construed. The bankruptcy court, holding that certain warehouse receipts were negotiable despite the lack of "order" or "bearer" language on their face, stated:

> The warehouse receipts ... were negotiable because they represented absolute title to the goods, were issued by the debtor, were endorsed by the debtor in blank, and were delivered [to the current holder]. Since the goods represented by the receipts could be obtained only upon presentation and surrender of the receipts, the goods were to be delivered to the bearer of the receipts. The receipts thus meet the requirements for negotiability.

*Id.* at 7. The court also rejected any notion that a document of title must contain the *exact* words as stated in section 7–104; the court found "no support for this assertion in the Uniform Commercial Code or the case law described thereunder." *Id.*

In *Gould v. City Bank & Trust Co.,* 213 F.2d 314, 315 (4th Cir.1954), the Fourth Circuit Court of Appeals held that certain warehouse receipts constituted negotiable documents of title, despite their failure to state that goods were deliverable to bearer or to the order of a named person. Although the language used failed to conform to the literal requirements of section 5 of the Uniform Warehouse Receipts Act (the predecessor to section 7–104(1)(a)), the court held that the receipts were documents of title, based on the language contained in them.

The reasoning of the bankruptcy court in *In re Kerr* is persuasive here. Although the holding certificates did not literally comply with section 7–104(1)(a), they represented title to the goods on their face, stating that there were no liens or encumbrances and that the metal was being held for DBL Trading's account or order. They were signed by Amoco's representative, and stated that the goods would be delivered when the certificates were properly endorsed.

Amoco has produced no law to show that its intent as to the certificates has any bearing on negotiability; yet it strongly denies that it intended the documents to be negotiable. However, even if intent is relevant, the testimony at trial merely demonstrated to this court Amoco's apathy about the documents' significance, until this suit was brought. For example, Mr. Sloss stated that he did not know what the documents signified overall, Tr. 284; he did not know what the specific word "encumbered" meant, *id.;* and he added the "order" language only because Susan Gold requested it. Tr. 266. Yet once the certificates were changed explicitly to add "order" language, the nature of the documents changed. Even if Amoco did not intend to change the significance of the holding certificates, it issued holding certificates that were in fact negotiable. There was nothing on the face of the certificates to indicate to outsiders any other intent on Amoco's part.

The official comment to section 7–104 notes that use of the words "Deliverable on proper indorsement and surrender of this receipt" does not render a document negotiable, because bailees may require such language to insure that a non-negotiable receipt is returned—i.e., to maintain records. *See supra* p. 263. Yet Mr. Sloss testified that the holding certificates were not always returned, and if a platinum lease was extended, he did not issue a new holding certificate but

---

**10.** The prior uniform acts required a document to state plainly "non-negotiable" or "not negotiable" if it was to be treated as such. *See* Uniform Warehouse Receipts Act, § 7, 3 U.L.A. 44 (1959); Uniform Bills of Lading Act, § 8, 4 U.L.A. 20 (1922). While this point is hardly decisive, it implies that the presumption is one of negotiability, even if a document fails to adhere exactly to the language in the statute.

allowed the old one to remain outstanding. Tr. 265. This casual manner of recordkeeping certainly indicates that Amoco did not put the language in purely for administrative purposes. Moreover, the fact that such language, standing alone, fails to render a document negotiable does not mean that the presence of these words automatically renders a document non-negotiable.

### III. Due Negotiation

■ Section 7–501(4) lays out the requirements for due negotiation. It states:

> A negotiable document of title is "duly negotiated" when it is negotiated ... to a holder who purchases it in good faith without notice of any defense against or claim to it on the part of any person and for value, unless it is established that the negotiation is not in the regular course of business or financing or involves receiving the document in settlement or payment of a money obligation.

*Id.* DBL Trading, by placing its indorsement on the back of the holding certificates, and then delivering the certificates to BNY, negotiated them to BNY. *See* U.C.C. § 7–501(1). BNY gave value for the certificates by providing credit of 95 percent of the platinum's value. *See id.* § 1–201(44)(a). The factual question involved, however, is whether BNY had notice of Amoco's claims to the document—i.e., whether BNY knew about Amoco's lease.[11]

The parties dispute whether the term "notice" required Amoco to show that BNY had actual knowledge of the lease, or if it must show merely that BNY should have known about it. Amoco cites to the definition of notice in section 1–201(25). It argues that the term "notice" includes reason to know, and that BNY had reason to know of the lease because information about the leases was given to Mr. Van Den Hogen at BNY. Under this definition, BNY potentially could be charged with constructive knowledge of Amoco's involvement.

BNY argues that Amoco is required to prove actual knowledge; the bank refers to "notice" as defined in Articles Three and Eight—in the context of the phrase "notice of claims or defenses ...," which only holds a party responsible if it has actual knowledge.

In the cross-references accompanying section 7–501, the reader is referred to the definition of notice in section 1–201(25). Although BNY presented a compelling argument that notice should only include actual knowledge, *see* Pl. Pre–T. Mem. at 59–74, the court is inclined to adopt the definition in Article 1 to which the cross-references refer. However, even under this standard, the court finds that Amoco has failed to show that BNY had notice of Amoco's claim to the platinum.

Section 1–201(25) provides, in full:

A person has "notice" of a fact when

(a) he has actual knowledge of it; or

(b) he has received a notice or notification of it; or

(c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

*Id.* BNY did not have actual knowledge under subsection (a). Mr. Van Den Hogen testified that he was never told that Amoco's leases overrode the bank's right to the platinum. Tr. 38. Furthermore, Ms. Murray, one of DBL Trading's representatives who worked with BNY, testified that she did not tell Mr. Van Den Hogen that the leases would prevent BNY from recovering the platinum in the event of default. Tr. 517. To her knowledge, Mr. Van Den Hogen was never made aware of Amoco's lease by DBL Trading.

Moreover, Mr. Van Den Hogen's behavior indicates that he believed the holding certificates gave BNY the right to immediate possession in the event of default. He filed financing statements in all jurisdictions where platinum was located. Tr. 34; Pl. Exh. 10. He rejected three holding certifi-

---

**11.** Although BNY also defends that it acted in good faith, Amoco does not appear seriously to challenge this assertion; nor would the court do so, since at trial there was no indication of bad faith on BNY's part. *See Chemical Bank v. Haskell*, 51 N.Y.2d 85, 92, 432 N.Y.S.2d 478, 480, 411 N.E.2d 1339 (1980).

cates that did not comply. Tr. 35–37; Pl. Exh. 11.

BNY also did not have notice of Amoco's lease agreements or the relation of those agreements to the holding certificates under subsections (b) and (c). Amoco relies on two letters to Mr. Van Den Hogen from DBL Trading, Pl. Exh. 3, 7; testimony about a meeting between BNY and DBL Trading; and a daily collateral report sent by DBL Trading to BNY, Def. Exh. AC, to show that BNY did receive notice. However, this court does not find that evidence persuasive.

A meeting was held on March 8, 1989, at which Mr. Van Den Hogen spoke with two DBL Trading representatives: Ralph Muscarella and Perry Rotkowitz. The only evidence of this meeting is a page from Mr. Van Den Hogen's datebook, Pl. Exh. 5, and a "call report" which he prepared and sent to his supervisor, Rosanne Witmer. Pl. Exh. 4. The synopsis of the call, which covers nearly a full page in single spaced type, makes no mention of any discussions about leases, or even discussions about overnight loans. Yet Mr. Muscarella claimed at trial that it was at this meeting—before BNY began accepting holding certificates—that the idea was discussed. He testified that the purpose of the meeting was to convince BNY to accept holding certificates as collateral. Tr. 1245. He also claimed that Mr. Van Den Hogen was shown a multi-page lease agreement, as an example, and was told about the leasing process. Tr. 1246. Mr. Van Den Hogen did not recall seeing such a lease, and Mr. Muscarella did not produce that agreement at trial.

Mr. Muscarella's testimony was unconvincing to this court. Even if he did show Mr. Van Den Hogen any kind of lease agreements, they were not the same as the holding certificates. The court also is not persuaded that the holding certificates were even a topic of discussion at the March 8 meeting. There is no mention of them at all in Mr. Van Den Hogen's call report. Moreover, since Mr. Muscarella stated that Ms. Murray was also at the meeting, it is difficult to believe that holding certificates were discussed; for one day later, on March 9, Ms. Murray sent Mr. Van Den Hogen a letter introducing the topic of using holding certificates as collateral. Pl. Exh. 3. She referred to holding certificates in the letter as if she and Mr. Van Den Hogen had never spoken of them before, and that is the conclusion that this court reaches.

Amoco also points to Ms. Murray's letter of March 9 as evidence that BNY received notice that there were leases underlying the holding certificates. Presumably this is because of the first paragraph, which mentions the business of leasing. However, this particular letter should be looked at in its entirety, and is set out in the margin.[12] Despite the mention of leases in the first paragraph, the rest of the letter unquestionably conveys the idea that DBL Trading owns the platinum outright; it even states that the holding certificates are marked to indicate "transfer of ownership to [BNY]." The four attached holding certificates, including one sample from Amoco, all contain wording substantially the same as the certificates at issue here. Pl. Exh. 3. The court finds that the letter, if anything, contains a notice of transfer of ownership by the use of holding certificates, and certainly does not serve to notify BNY that Amoco, by its leases, would take priority over a creditor holding the certificates as collateral in the event of a default.

12. The letter, from Ms. Murray to Mr. Van Den Hogen, states:

> Drexel is in the business of leasing precious metal to various companies. The terms and conditions of each lease are strictly defined and the ownership and title to the material is formally certified in a "Holding Certificate" presented by these companies to Drexel at the inception of each lease.
>
> These Holding Certificates represent ownership by Drexel and are used by us as bearer documents to be endorsed over and used as collateral against borrowings.
>
> I have attached examples of Holding Certificates which describe in detail the terms and ownership of these contracts. Note that I have marked these copies to appear as endorsement and transfer of ownership to you.
>
> Please review these documents and advise [sic] any comments or questions you may have. I would like to start including these Holding Certificates as part of our existing collateral base to be used in our continued borrowings with The Bank of New York.
>
> Pl. Exh. 3.

A letter sent on April 28, 1989 from Ms. Murray to Mr. Van Den Hogen similarly failed to put BNY on notice. The letter states that Ms. Murray has enclosed a "listing of the companies holding precious metal for Drexel." Pl. Exh. 7. Amoco makes much of the fact that the accompanying list is headed, "Companies Leasing Metal from [Amoco]." However, the letter itself merely states that these companies are holding the metal, not that they are leasing it. Moreover, there is absolutely no language in the letter indicating that the leases would have any priority at all over a claim by BNY in the event of default.[13]

Finally, Amoco relies on the daily collateral reports that were sent by DBL Trading to BNY. Def. Exh. AC. Such a report was sent to BNY by DBL Trading daily; it listed all the goods serving at that time as collateral for overnight loans from BNY to DBL Trading. Each time a holding certificate appears on the list, a date appears next to it.

Noting that the date corresponds to the expiration date of its leases from DBL Trading, Amoco argues that the collateral reports constitute notice to BNY that Amoco's leases would defeat BNY's interest in the collateral in the event of a default. This court is not willing to require that BNY draw such a conclusion. Again, there was no mention in the reports—or elsewhere—that BNY was told the significance of these expiration dates relative to the holding certificates; the bank did not have reason to know what the dates meant.

Because BNY accepted the holding certificates without notice of Amoco's claims to the platinum, the certificates were duly negotiated.

## IV. Amoco's Defense of Reasonableness

■ Amoco claims that it acted reasonably in holding the platinum while attempting to ascertain who had ownership rights in the platinum; it argues that this reasonableness

precludes a finding in BNY's favor on the conversion claim.

Amoco's in-house counsel, Matthew Gallo, and Rosanne Witmer, a senior Vice President at BNY, testified about communications between Amoco and BNY after DBL Trading defaulted on its overnight loans on February 13, 1990. At Ms. Witmer's direction, Barbara Hyland initially sent a letter to DBL Trading demanding payment on behalf of the bank. Pl. Exh. 18; Tr. 175. BNY also immediately began to liquidate the collateral that it held on DBL Trading's loans. Tr. 800–01.

On February 15, Ms. Hyland spoke with Mr. Sloss at Amoco, as she had been advised to do by DBL Trading. Tr. 807. Mr. Sloss testified that he "was very surprised by the call. You know, I tried to be polite and tell her that my agreement for the metal was with [DBL Trading], but that I would certainly discuss it with the law firm." Tr. 276. He also claimed that Ms. Hyland only asked about reclaiming the platinum after the leases expired. In her testimony, on the other hand, Ms. Hyland claimed, "I do believe ... [Mr. Sloss] could have mentioned lease and I said that I had not seen any of the underlying lease transactions nor was I aware that there were specific leases tied to these holding certificates." Tr. 809.

Ms. Hyland also sent a letter requesting the metal to Mr. Sloss on February 15. Pl. Exh. 19. This letter eventually made its way to Mr. Gallo. He apparently was confused by her letter, Tr. 427–29, although it seems to the court to be fairly straightforward. In connection with the possibility of selling the platinum, Mr. Van Den Hogen had DBL Trading send Mr. Sloss a letter amending delivery instructions and told Mr. Sloss to deliver to Johnson Matthey to the account and order of BNY. Def. Exh. E; Tr. 43. In the meantime, on February 23, Mr. Van Den Hogen called Mr. Muscarella at DBL Trading, asking him to provide copies of the leases between Amoco and DBL Trading. Tr.

13. The list was sent so that BNY could file financing statements, to perfect a security interest in the platinum wherever holding companies were located. Ms. Murray refers to this in her letter, and it is clear that BNY would not begin using the holding certificates as collateral until the financing statements were in place. See Pl. Exh. 7; Pl. Exh. 6.

40–42; Pl. Exh. 14.[14]

After at least a week, Ms. Hyland had not heard from Mr. Sloss; she called him and again demanded the release of the platinum. Mr. Sloss told her he would advise her of a decision on or about March 6. Tr. 494. Ms. Hyland wrote to Mr. Sloss again on March 2, 1990, this time asking that Amoco transfer the metal by issuing new holding certificates, and offering to allow Amoco to hold the metal until the expiration of each lease. Def. Exh. F. Mr. Van Den Hogen testified that BNY offered this concession "in view of the business relationship that the Bank of New York maintained with Amoco." Tr. 42. BNY required new holding certificates and specific release dates in order to try to sell the platinum in a futures transaction. Tr. 175–76, 827–30. The bank made this offer "[w]ithout waiving any claim or right which the Bank may have as a result of Amoco's refusal to honor the Bank's earlier request...." *Id.* Presumably some conversation took place between BNY and Amoco after Amoco received this letter; for Ms. Hyland wrote to Amoco yet again on March 5, 1990. Def. Exh. G. Her letter again stressed that the bank had an unencumbered right of ownership in the metal, but she offered Amoco indemnification if it would release the metal or issue new holding certificates in the bank's name. Ultimately, Amoco agreed to deliver the platinum on condition that BNY seek damages in this action of only $550,000, and a transfer of platinum was made on April 4, 1990—well over a month after DBL Trading's default on the loan from BNY.

Under the circumstances, the court is not convinced that Amoco's refusal was reasonable. First, Mr. Gallo's failure to understand BNY's requests does not indicate confusion so much as a lack of research on his part. Mr. Gallo had only passing familiarity with Article 7 of the U.C.C., as he testified at trial. Tr. 1336–37. While Amoco may have faced some confusion at the outset, its own internal procedures—the issuance of holding certificates—caused BNY to have a docu-ment giving it ownership of the platinum. Despite the fact that Amoco was leasing from DBL Trading, the conflicting claim from BNY did not give Amoco the right to *ignore* that claim when in fact its own holding certificates were what transferred that right. Any conduct by Amoco other than immediate surrender of the platinum was unreasonable.

*V. Damages Calculation*

■ After bringing this lawsuit, BNY made a partial settlement agreement with Amoco, in which BNY agreed to seek no more than $550,000.00 in this action. The parties have stipulated that BNY would have been able to sell the platinum on February 15, when it was entitled to the metal. Pl. Exh. 35. Given the listings for the sale of platinum at that time, it appears that BNY could have sold the metal at a price of $522.90 per ounce. Pl. Exh. 22. In fact, BNY was not able to sell until April 4, 1990, when it sold the 22,230 ounces platinum it obtained from Amoco at a price of $471.70 per troy ounce. Thus BNY sustained a loss of $51.20 per ounce, which when multiplied by the total 22,230 ounces leads to damages of $1,138,176.00. Of course, this amount well exceeds the $550,000 limitation in this action, and BNY consequently is entitled to the full amount of $550,000.00, with interest from April 4, 1990.

■ The court disagrees with BNY's second request for damages. According to BNY, it is entitled to interest on the sum of $11,624,067.00 from February 15, 1990 through April 4, 1990—the period during which Amoco wrongfully withheld the platinum. The $11.6 million figure is arrived at by multiplying the amount of platinum, 22,230 ounces, by its price per ounce on February 15. However, the court sees no reason why BNY should be awarded the interest on this amount. It explicitly agreed to limit this action to $550,000, which can rightfully include a request for interest only on that amount. BNY cannot recover in this action interest on amounts that it has agreed not to seek at trial.

14. The fact that Mr. Van Den Hogen had copies of the leases faxed to BNY certainly supports the finding that prior to that time, no one at BNY had seen copies of the leases, or knew of their existence before that time.

## CONCLUSION

The court finds that the holding certificates issued by Amoco constituted negotiable documents of title that were duly negotiated to BNY by DBL Trading. Plaintiff is to be awarded $550,000.00, as the agreed upon limit, and prejudgment interest thereupon from April 4, 1990. Plaintiff to submit judgment in accordance herewith.

This Opinion shall constitute the findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

SO ORDERED.